CHELSEA NEIGHBORHOOD ASSOCIATIONS et al., Plaintiffs-Appellees,

v.

UNITED STATES POSTAL SERVICE and E. T. Klassen, Individually and as Postmaster General, Defendants-Appellants.

No. 979, Docket 75–6005.

United States Court of Appeals, Second Circuit.

Argued April 10, 1975.

Decided April 30, 1975.

John S. Siffert, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., Mel P. Barkan, Asst. U. S. Atty., on the brief), for appellants.

Peter A. A. Berle, New York City (Berle, Butzel & Kass, Albert K. Butzel, Peter J. Millock, New York City, on the brief), for appellees.

Before FRIENDLY and FEINBERG, Circuit Judges, and LASKER, District Judge.*

FEINBERG, Circuit Judge:

The United States Postal Service (the Service)[1] appeals from a decision of the United States District Court for the Southern District of New York, Robert J. Ward, J., enjoining it "from entering into any contract for, or proceeding in any way with, the construction of the U. S. Postal Service Vehicle Maintenance Facility" in the Chelsea neighborhood of Manhattan "pending final determination of this action or alternatively, pending

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. The action was brought against the Postal Service and E. T. Klassen, individually and as Postmaster General. For convenience, we will refer to only the Postal Service as the party in interest.

. . . . [the district] court's determination that there has been compliance with NEPA, 42 U.S.C. § 4332(2)(C)." The preliminary injunction was granted upon the motion of plaintiffs, a group of Chelsea neighborhood associations and individuals residing in the area. We affirm the order of the district court.[2]

I. *Background*

In 1968, the then Post Office Department[3] acquired a square-block site next to the Morgan Station postal facility in New York City. Subsequently, it was proposed that the ground levels be used for a Vehicle Maintenance Facility (VMF) and the air space be granted to New York City for public housing. An apartment complex was to be built on the roof of the VMF. This was agreed upon in 1972,[4] and the New York District Army Corps of Engineers commenced preparing an Environmental Impact Statement (EIS) for the project. The first draft of the EIS was released to the public in January 1973. Another draft was prepared and circulated. The final Statement, dated March 26, 1974, was submitted to the Council on Environmental Quality, which published its receipt on April 8, 1974, in the Federal Register. 39 Fed.Reg. 12783 (1974). The EIS described the subject matter of this lawsuit as the construction

> of a major U. S. Postal Service vehicle maintenance facility (VMF) in combination with a multi-story housing project in the lower West Side of the Borough of Manhattan, New York City. The project will occupy an entire city block, presently vacant, adjacent to the Morgan Station mail processing center. Features of the proposed action are a multi-story VMF, a housing project of approximately 860 units utilizing air rights space above

the VMF, and the closure of 29th Street between Ninth and Tenth Avenues to non-postal traffic, except during the evening rush period.[5]

Plaintiffs characterize the VMF as a huge garage with space for over 900 vehicles. Its concrete walls would rise directly from the sidewalk for approximately 80 feet, on top of which would be a flat platform with housing extending upward from there. Noting that approximately 2,200 truck movements in and out of the VMF are anticipated daily, plaintiffs contend that the impact of the garage would devastate their community. The Service points out that many of the trucks would travel to and from the adjacent Morgan Station in any event; the Service also minimizes the impact of the VMF, asserting that it is not located in the Chelsea residential area, but rather on the border between Chelsea and a commercial district. According to the Service, the VMF will actually act as a buffer against further commercial encroachment and help stabilize the area. Nevertheless, plaintiffs clearly do not want the VMF in or near Chelsea. In July 1974, they requested the Service in writing to abandon the VMF and convey the site to the City for strictly residential purposes. Plaintiffs suggested that another site, the Yale Express garage located ten blocks away, be considered. The Service rejected the demand and this action followed. Plaintiffs sought to enjoin the project until the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq., and the Clean Air Act, 42 U.S.C. § 1857 et seq., had been fully complied with, and asked for a mandate directing the Service to reconsider the VMF in light of the availability of the Yale Express garage. Thereafter, the Service solicited and obtained bids

---

2. The injunction is dated February 28, 1975. The judge's thorough opinion is reported at 389 F.Supp. 1171 (S.D.N.Y.).

3. The Post Office Department is now the United States Postal Service by virtue of the Postal Reorganization Act of 1970, Pub.L.No.91–375, 84 Stat. 719, 39 U.S.C. § 101 et seq.

4. The air rights to the site were expressly granted to the City by § 6(b) of Pub.L.No.92–313, 86 Stat. 216. See 1 U.S.Code Cong. & Ad.News, 92d Cong., 2d Sess. 1972, at 262.

5. EIS at 1.

for construction of the VMF alone. Upon plaintiffs' motion, Judge Ward granted a preliminary injunction, finding that the Service was subject to NEPA, and that the EIS already prepared was inadequate. The Clean Air Act and Yale Express allegations were not considered. The judge also denied without prejudice the Service's motion to dismiss or for summary judgment on the Clean Air Act claims.

On appeal, the Service contends, as it did below, that it is exempt from NEPA. If it is not exempt, the Service argues that the EIS already filed was sufficient. Finally, the Service asks us to dismiss plaintiffs' Clean Air Act claims even though they were not reached below.

II. *The Postal Service is subject to NEPA*

■ Appellant's claim that it is exempt from the requirements of NEPA compels a close examination of the language and policy of two statutes: NEPA and the Postal Reorganization Act of 1970, upon which appellant relies. The requirements of NEPA are, by this time, well known. That Act provides, among other things, that

(2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided. should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environ-

ment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

42 U.S.C. § 4332(2)(C). It is clear that NEPA was designed to cover almost every form of significant federal activity. Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). The Service concedes that the VMF-housing project is a "major" federal action "significantly affecting the quality of the human environment." Indeed, appellant admits that were it not for section 410 of the Postal Reorganization Act of 1970, 39 U.S.C. § 410, it too would have to comply with NEPA.[6] However, according to the Service, section 410 removes it from the environmental mandate Congress has imposed on all federal agencies.

Section 410 provides in part:

(a) Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or

---

**6.** Service Brief at 17. Although the Service contends that it is not subject to NEPA, its own regulations provide that it will voluntarily comply with the Act's requirements "to the

extent practical and feasible consistent with the public interest and fulfillment of the primary mission of the Postal Service." 39 C.F.R. § 775.1(b).

regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service.

The Service contends that this exemption is a generous one, emphasizing not only the variety of subjects covered but also the breadth of the phrase "dealing with." But the exemption in section 410 is obviously not unlimited, and the precise question before us is whether NEPA is properly characterized as a law "dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds." Although the question is a close one, we conclude that it should be answered in the negative.

The Postal Reorganization Act was passed to

> Eliminate serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with the modern management and business practices that must be available if the American public is to enjoy efficient and economical postal service
>
> .   .   .   .

H.R.Rep.No.91–1104, 91st Cong., 2d Sess. 2 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3649, 3650. It was apparent that Congress felt the old Post Office Department to be entangled in layers of restrictive laws and regulations.

> The committee's inquiries and every responsible study show that the Postmaster General is blocked or undercut at every turn by a labyrinth of postal statutes echoing every postal concern, interest, or whim expressed by Con-

gress over a 200-year period. Laws have changed laws and have added to the body of them so that, by accretion, they have multiplied, decade by decade, leaving the Postmaster General bound in his own house. Twist and turn as he may, he cannot function in the public interest as a responsible manager.

S.Rep.No.91–912, 91st Cong., 2d Sess. 2 (1970). Congress intended to free the Service from the shackles of the past so it could operate its day-to-day affairs in a "businesslike way." H.R.Rep.No.91–1104, supra, at 5. Congress wanted the Service to update "financial policy," modernize "employee-management relations," procure "flexible and efficient transportation services," and determine postal rates professionally. Id. Thus, the reference in section 410(a) to federal laws relating to "contracts, property, works, officers, employees, budgets, or funds" reflected a congressional focus on efficient day-to-day management of the new Service.[7]

■ NEPA, passed in response to widespread public concern about the nature and quality of our environment,[8] is an entirely different type of law. To quote from the Act's declaration of national environmental policy:

> The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is

---

7. Even those laws that are made expressly applicable to the new Service by § 410(b) concern, almost exclusively, day-to-day affairs, e. g., laws relating to withholding city income taxes, employment of retired military officers, security clearance of applicants, employment of relatives and preference for blind persons. Section 410(b) does expressly make the Free-

dom of Information Act, 5 U.S.C. § 552, applicable to the Service, but even this more general statute primarily affects day-to-day contact of the Service with the public.

8. S.Rep.No.91–296, 91st Cong., 1st Sess. 8 (1969).

the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a). The contrast between the specific concerns of section 410 and the broad policy mandate of NEPA is instructive. The Postal Reorganization Act was designed to modernize the day-to-day operation of the Service; NEPA was passed "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. Section 410 involves "contracts, property" and "works"; NEPA encompasses major agency actions "such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of on-going programs." S.Rep.No.91–296, supra, at 20. The Postal Reorganization Act is managerial; NEPA is policy oriented. In fact, insofar as the former act was designed to enhance day-to-day business discretion, NEPA in no way interferes. NEPA does not require specific results in particular situations. It merely establishes a "reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations." *Calvert Cliffs'*, supra, 449 F.2d at 1112.

Our conclusion that NEPA is not the kind of federal law envisioned by section 410 of the Postal Reorganization Act is fortified by the sequence of passage of the two statutes. The legislation that became NEPA passed the Senate and the House in July and September 1969, respectively,[9] and after conference was finally enacted and made effective January 1, 1970.[10] The Postal Reorganization Act was enacted on August 12, 1970, but its genesis began at least as early as January 3, 1969, when postal reform legislation was placed before the House, and April 22, 1969, when full Committee hearings began on a bill that was the forerunner of the Act. H.R.Rep.No.91–1104, supra, at 2–4. It is most unlikely that Congress had in mind the almost contemporaneous provisions of NEPA as one of those ancient accretions of "legislative, budgetary, financial, and personnel policies that . . . [were] outmoded, unnecessary, and inconsistent with . . . modern management and business practices," id. at 2, U.S. Code Cong. & Admin.News 1970, p. 3650, and therefore covered by the exemption of section 410(a).

The Service contends that later legislative developments argue against this conclusion. It points out that in 1973, at a time when the Service position regarding NEPA was already known, Representative Keating introduced a bill that would make NEPA applicable to the Service[11] but Congress did not act upon it. It would be dangerous, however, to draw any inference from such inaction. Congress is exceedingly busy and most members probably never knew of Representative Keating's bill which, so far as we have been told, did not even reach the stage of committee consideration.[12] Appellant also stresses that Congress expressly made the Service subject to the Noise Control Act of 1972, 42 U.S.C. § 4901 et seq. Here too, conflicting inferences are possible. The Service suggests that when Congress wished to make it subject to an "environmental

9. 2 U.S.Code Cong. & Ad.News, 91st Cong., 1st Sess. 1969, at 2751.

10. 1 U.S.Code Cong. & Ad.News, 91st Cong., 1st Sess. 1969, at 954.

11. 119 Cong.Rec. 28265 (1973).

12. Cf. F.T.C. v. Dean Foods Co., 384 U.S. 597, 608–11, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966); Wong Yang Sung v. McGrath, 339 U.S. 33, 47–48, 70 S.Ct. 445, 94 L.Ed. 616 (1950); United States v. Underwriters Ass'n, 322 U.S. 533, 559–61, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

statute" Congress knew how to do so. However, NEPA was enacted before the Postal Reorganization Act, while the Noise Control Act was passed over two years later. In addition, it can be said that by including the Service among the agencies subject to the Noise Control Act, Congress was merely reaffirming the importance of having environmental legislation apply as widely as possible.[13] We do not suggest that congressional intent on the issue before us is as clear as crystal.[14] We believe only that, as best as we can make out its clouded will, Congress did not have a statute like NEPA in mind when it listed the exemptions in section 410(a).

In addition, the policy considerations behind NEPA are particularly compelling. Congress made that clear in section 102 of NEPA, 42 U.S.C. § 4332, which provides that:

> The Congress authorizes and directs that, *to the fullest extent possible* : (1) the policies, regulations, and public laws of the United States *shall* be interpreted and administered in accordance with the policies set forth in this chapter . . .

and commands "*all* agencies of the Federal Government" to follow specified procedures. (Emphasis added.) These are strong words. The Council on Environmental Quality has, as the district court observed, lent added emphasis to this language by noting in its Guidelines that every federal agency "shall comply with . . . [NEPA's procedural and other mandates] unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible."[15] We do not suggest that the policy animating the Postal Reorganization Act is insignificant or should be ignored. But Congress apparently regarded the NEPA goal of a better environment as unusually important. Surely we should be slow to hold NEPA, as applied to the Service, repealed by implication, cf. Regional Rail Reorganization Act Cases, 419 U.S. 102, 133, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), even though there is a need to streamline postal efficiency by freeing the Service from red tape. See Morgan Associates v. United States Postal Service, 511 F.2d 1223, 1224 n.2 (2d Cir. 1975). Moreover, there is a limit to how far the private enterprise analogy can be pushed. While Congress has made the Service less like a government agency and more like a private business, the Service is still a hybrid; it does furnish an essential public service and has public functions and responsibilities.[16] Indeed, this is the justification for the position the Service takes that it is "not required to comply with local zoning laws."[17] If that position is sound and if the Service is not subject to NEPA, then its power to build hundreds of postal facilities all over the nation, unhampered by the environmental concerns of the local community, would be under little or no legal control.[18] While the Service commendably has recognized such concerns,[19] there is a world of difference between requirements im-

---

13. It can also be said that when Congress did not want NEPA to apply to the actions of a governmental agency, it knew how to make that clear. Cf. the statutory exemption to NEPA contained in the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1371(c)(1).

14. For portions of the legislative history of the Postal Reorganization Act supporting the view of the Service, see, e. g., 116 Cong.Rec. 21709 (1970) (Remarks of Senator McGee).

15. 40 C.F.R. § 1500.4.

16. The Senate Report accompanying the Postal Reorganization Act states: "[T]he Postal Service is in fact and shall be operated as a service to the American people, not as a business enterprise." S.Rep.No.91–912, supra, at 4. The House Report notes: "The Postal Service is— first, last and always—a public service." H.R. Rep.No.91–1104, supra, at 19.

17. Letter to the court, dated April 11, 1975, p. 2.

18. According to Senator McGee, one of the sponsors of the Postal Reorganization Act, there were in 1970 "more than 30,000 post offices." 116 Cong.Rec. 21709 (1970). Of course, not every construction or modernization of a postal facility would be, under NEPA, a "major" federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

19. See note 6 supra.

posed by statute and those assumed voluntarily and with reservations.

What little case authority we have found tends to support our conclusion that the Service is subject to the requirements of NEPA. In Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971), administrators of the Law Enforcement Assistance Administration argued that certain provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3701 et seq., mandated a federal policy of "hands off" the local police, and barred the application of NEPA to grants made to local law enforcement under the Safe Streets Act. The court rejected that claim, noting that the policy of the Safe Streets Act was "not as sweeping as the LEAA contends" and that all federal agencies are under "an injunction . . . to exert utmost efforts to apply NEPA to their own operations." 451 F.2d at 1137–38. The court also rejected the LEAA's administrative interpretation that held NEPA to be inapplicable, noting that the usual presumption of correctness that accompanies administrative interpretations did not apply to the LEAA's interpretation of NEPA since NEPA was beyond the agency's area of expertise.[20] 451 F.2d at 1135–36 n. 14. We realize that the case is suggestive only, since the exemptive language in section 410(a) had no precise counterpart in the Safe Streets Act.

Only one case has directly treated the ostensible conflict between section 410(a) and NEPA. In City of Thousand Oaks v. United States, CV 74–2186–JWC (C.D. Cal. Sept. 3, 1974), plaintiff requested an injunction against the construction of a post office on the ground that no EIS had been filed. The district court refused the injunction, holding that because of section 410 NEPA did not apply to the Service. In a one-page order filed on the day of argument of the expedited appeal, the Ninth Circuit stated: "We do not approve the basis upon which the trial court dismissed, but we affirm the judgment." The appeals court held that the "negative statement" filed by the Service was adequate. City of Thousand Oaks v. United States, No. 74–2685 (9th Cir. Oct. 1, 1974). Here, too, the precedent is less than compelling because of the lack of discussion, but the case does tend to support the result we reach.[21]

■ In sum, the issue before us is a difficult one. But from a careful examination of NEPA and the Postal Reorganization Act, the relevant legislative history of these statutes, the policies behind them and the limited guidance from the cases, we conclude that section 410(a) does not exempt the Service from NEPA and that the Service must comply with the requirements of that statute.

## III. Adequacy of the Environmental Impact Statement

■ Having decided that the Service must comply with NEPA, we turn to the Environmental Impact Statement actually filed. The adequacy of an EIS can only be considered in light of its purpose. "The primary purpose of the impact statement is to compel federal agencies to give serious weight to environmental factors in making discretionary choices." Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697 (2d Cir. 1972). NEPA, in effect, requires a broadly defined cost-benefit analysis of major federal activities. It seeks to in-

20. The same observation would apply to the Service's interpretation that it need not comply with NEPA. See 39 C.F.R. § 775.1(c).

21. The parties also rely on two other cases that we find less relevant. Appellant cites Cohen v. Price Comm'n, 337 F.Supp. 1236 (S.D. N.Y.1972), which held that NEPA is inapplicable to the Price Commission on the ground that the Price Commission was a temporary agency designed to act quickly, while NEPA stressed long-range environmental policies. The Service, as a permanent agency engaged in many building projects, clearly has a greater potential for long-range environmental effect. Appellees cite Maryland-National Capital Park and Planning Comm'n v. United States Postal Service, 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973), as recognizing that the Service is subject to NEPA, but the effect of § 410, not having been raised by the Service, was not discussed in the court's opinion.

sure that more than economic costs alone are considered.

"Environmental amenities" will often be in conflict with "economic and technical considerations." To "consider" the former "along with" the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and "systematic" balancing analysis in each instance.

*Calvert Cliffs'*, supra, 449 F.2d at 1113. NEPA is, "at the very least, 'an environmental full disclosure law.'" *Monroe County*, supra, 472 F.2d at 697.

■ The EIS in this case describes the "Proposed Action," as already noted, as "a major U. S. Postal Service vehicle maintenance facility (VMF) in combination with a multi-story housing project." The EIS is a sizeable document whose very bulk is impressive.[22] Unfortunately for the Service, however, Judge Ward was not sufficiently impressed with its substance, finding it lacking in three respects.[23] These were the failure of the EIS to discuss sufficiently (1) the impact of the proposed housing; (2) the possibility that no housing would ever be erected; and (3) alternatives to the proposed construction.

Turning to the first of these alleged inadequacies, the judge found that one shortcoming of the EIS lay in using the housing portion of the project as a virtue, while ignoring many of its associated disadvantages. There is no doubt that the air-rights housing was a chief "selling point" for the entire project. In the "Assessment of Trade-Offs" section of the EIS, the paragraph concerning beneficial consequences ends as follows:

Most importantly, the proposed project is a response to a pressing local housing need, to which the community readily admits.

And the ultimate finding is:

It is the conclusion of this Statement that the *net effect* of the project development is positive, as it represents an improvement of Postal Service operations as well as a much needed source of low- and moderate-income housing for the Chelsea-Clinton community. [Emphasis in the original.]

EIS at III–35–36. The summary portion of the EIS, in the section concerning impacts, notes: "The most significant impact of the project is the positive response to a pressing and obvious need for low- and moderate-income housing in the area." EIS at 3. And there are other instances where the project is justified on the basis of the housing.

Yet the EIS does not contain a comprehensive analysis of the environmental impact of the housing. There is brief mention of possible overcrowding at a local elementary school, the need for future expansion of local health services, and the effect on park usage. But the report does not treat the effect of the housing with anywhere near the thoroughness accorded the VMF. For example, the VMF will require closing 29th Street for most of the day and diversion of traffic onto adjacent streets. The EIS states that tightened parking enforcement on those streets will help keep the extra volume of traffic flowing. But the statement does not consider where those parked cars will go; nor does it discuss what will be done with the automobiles of the residents of the proposed 860 apartments in the air-rights housing[24] or the automobiles of

22. The EIS contains over 250 pages.

23. While the court did not make explicit the standard of review it applied to the sufficiency of the EIS, we believe it applied the proper test: Was the agency's consideration of the factors listed in 42 U.S.C. § 4332(2)(C) arbitrary, capricious, or an abuse of discretion? Hanly v. Kleindienst, 471 F.2d 823, 829 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); Citizens to Pre-

serve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971).

24. The EIS, at I–5, notes that there will be 160 off-street parking spaces for housing residents. This is now known to be incorrect.

the 1,500 drivers and employees of the VMF. The required support services for the housing are not adequately discussed. Garbage collection is disposed of by a single paragraph stating, in effect, that it will all be trucked away. What will be the expected noise and air pollution contribution from those trucks is not adequately discussed.

■ A possibly more serious shortcoming of the housing analysis lies in the social, not physical, sciences. What effect will living at the top of an 80-foot plateau have on the residents of the air-rights housing? Will there be an emotional as well as physical isolation from the community? Will that isolation exacerbate the predicted rise in crime due to the increase in population density? That an EIS must consider these human factors is well established. Hanly v. Mitchell, 460 F.2d 640, 647 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). The EIS gives scant attention to these serious questions. It acknowledges that "project size, height and design and the incidence of crime" are all related. EIS at III–31. But the only response is to suggest that "[p]roject design should reflect this emerging body of research to the extent practicable." Id. This is not enough. We do not know whether informed social scientists would conclude that the top of the VMF would likely become a human jungle, unsafe at night and unappealing during the day. The question must be faced, however, by those who plan the project.[25]

■■ In short, we agree with Judge Ward that the impact of the housing was not accorded the "full consideration"

required by NEPA. See Calvert Cliffs', supra, 449 F.2d at 1128. The Service argues that since the housing portion of the project is speculative it cannot be required to assess the unknowable or to postpone the VMF indefinitely. We agree that the Service can only do the possible, but the total number of apartment units has been approximated and an evaluation of probable environmental impact need not await final detailed design.

■ The Service also contends that any inadequacy in the EIS treatment of housing is irrelevant because the entire project was, in effect, "segmented" by Congress into two parts—a VMF to be built by the Service and housing to be built by New York City.[26] Since some other agency will construct the apartments, the Service asserts that a housing EIS is not its responsibility. But segmentation is not really the issue now before us. It is correct that the Service will not build the housing portion of this project, but even so, the Service cannot ignore it. If the potential impact of the housing is not considered before the VMF is constructed, it will be too late to reassess the project as a whole no matter what is shown by a later EIS for the housing prepared by another agency. "The statutory mandate is not fulfilled by vague generalities or pious and self-serving resolutions or by assuming that someone else will take care of it." Monroe County, supra, 472 F.2d at 700. Moreover, using the housing as a "selling point" without disclosing its possible negative aspects is certainly not the "environmental full disclosure" called for by NEPA. See Monroe County, supra, 472 F.2d at 697.

**25.** The Senate Committee Report accompanying NEPA states:

Using an interdisciplinary approach . . . would result in better planning and better projects. Too often planning is the exclusive province of the engineer and cost analyst.

S.Rep.No.91–296, supra, at 20. The treatment in the EIS of the social impact of the housing suggests that the narrow approach feared by the drafters occurred.

**26.** By Pub.L.No.92–313, referred to in note 4 supra. Compare Sierra Club v. Stamm, 507 F.2d 788, 790–93 (10th Cir. 1974), and Sierra Club v. Callaway, 499 F.2d 982, 987–88 (5th Cir. 1974), with Named Individual Members of the San Antonio Conservation Soc'y v. Texas Highway Dep't, 446 F.2d 1013, 1022–24 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972), and Thompson v. Fugate, 347 F.Supp. 120, 123–24 (E.D.Va. 1972).

■ This brings us to the failure of the EIS to disclose that the housing might never be built at all, the second defect found by Judge Ward. While the impact of the VMF alone was analyzed, the treatment of the VMF without housing was in some instances perfunctory compared with the analysis of the VMF with housing.[27] This defect in itself may well be easily remedied. More significant, however, is the failure to assess the importance and impact of the VMF by itself. The lack is fatal to the EIS for it is at least possible that without the housing the "Assessment of Trade Offs" would result in a decision not to proceed with the project at all. We do not suggest that it would be arbitrary or capricious for the Service to reach a contrary conclusion, but such a judgment must come only after full consideration of the VMF standing alone.

■ Finally, Judge Ward found the EIS inadequate in its discussion of alternatives, holding that treatment of the "No Action" and "Scatter Site" possibilities was "conclusory and uninformative." Citing Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) ("NEPA's 'alternatives' discussion is subject to a construction of reasonableness"), the Service argues that since studies over the past decade all agree on the need for a consolidated VMF, certain alternatives could be rejected in the EIS without detailed analysis. But these studies were not made part of the EIS and so invocation of them cannot alone "permit a reasoned choice of alternatives." Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). Without a more detailed analysis of the rejected alternatives the community and other agencies will have no way of checking on the validity of the Service's conclusions. See *Calvert Cliffs'*, su-

pra, 449 F.2d at 1114. If, as the Service contends, there are studies conclusively showing the need for a consolidated VMF and rejecting various alternatives, it should be a simple matter to include in a revised EIS the supporting data from these studies.

Plaintiffs also argue strenuously that the EIS is defective because it does not deal with the suggested alternative location of the Yale Express garage. See *Monroe County*, supra, 472 F.2d at 697–98. The Service contends that it was not required to consider that site because its availability was not known until after the EIS was completed. The district judge never reached this issue. Since the EIS must be revised in any event, the Yale Express location should be considered as one of the possible alternatives to the Chelsea VMF.

■ In sum, we agree with the district court that the Service has failed to meet the requirements of NEPA in making "a careful and informed decision," and we affirm the injunction of the district court. We do not suggest, however, that the Service will be unable to comply with NEPA, or that it will necessarily take it a long time to do so, although compliance, of course, must be thorough not perfunctory. The district court, as noted above, enjoined the Service not only from proceeding with construction of the VMF but also from entering into any contract. When we heard argument on April 10, 1975, the bids for the VMF were scheduled to expire on April 21, 1975. We have since been informed that the first and second lowest bidders have agreed to extend their bids until May 20 and May 21, respectively, and two other bidders have given the Service until June 10. Under the circumstances, it may be that the Service, in the exercise of business judgment, would want to take the risk of accepting one of the bids on the assumption that a satisfactory

---

27. E. g., using the apartment towers as exhaust stacks is given a full analysis and is considered significant in maintaining an acceptable level of pollutants in the neighbor-

hood. Venting the exhaust gasses directly onto the VMF roof, however, is treated as a temporary condition.

EIS still favoring the VMF at Chelsea can be prepared and filed in the near future. We express no view as to this other than to note that, should the Service so request before the mandate issues, we would consider granting a stay of the injunction for that limited purpose.[28] Cf. Hanly v. Mitchell, supra, 460 F.2d at 649.

### IV. *Clean Air Act Claims*

█ Plaintiffs' request in the district court for a preliminary injunction was also based upon alleged violations of the Clean Air Act, 42 U.S.C. § 1857 et seq. The Service moved to dismiss those allegations claiming, among other things, that the Clean Air Act did not apply to it and that the Service was not required to request an indirect source permit from the State of New York. The district judge denied defendant's motion to dismiss or for summary judgment, and the opinion granting plaintiffs' motion for a preliminary injunction based upon non-compliance with NEPA did not discuss the Clean Air Act claims. Nonetheless, the Service seeks to appeal the denial of its motion and asks us to dismiss plaintiffs' Clean Air Act claims. Plaintiffs move to dismiss that portion of the appeal. The motion is granted. "Denial of a motion to dismiss is not a final order and is therefore not appealable." 2A J. Moore, Federal Practice ¶ 12.14, at 2338 (2d ed. 1948). Nor is denial of a motion for summary judgment appealable. 6 Id., ¶ 56.20[2], at 2745. Perhaps on the portion of the Service's appeal that is properly before us we might consider the Clean Air Act issues to the extent that the Service claims it is exempt from that Act as a matter of law. See 9 Id., ¶ 110.25[1], at 270, 273, and Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189 (1940). However, while we have not fully determined the matter, we lean toward the view that the Service is not exempt. This would still leave undecid-

ed the more complex Clean Air Act issues raised by the parties. Accordingly, we see no persuasive reason for considering the Clean Air Act claims, particularly since the status of the New York State Clean Air regulations is apparently in flux and the lower court has not yet determined any relevant facts.

The judgment of the district court is affirmed. The appeal from that portion of the order denying the Service's motion to dismiss or for summary judgment on the Clean Air Act claims is dismissed.

---

**28.** Any such stay would necessarily be conditioned on the Government's stipulating that it would make no claim that its liability for dam-ages should be weighed in determining any issues that may subsequently arise.