CITY OF ROCHESTER and Genessee-Finger Lakes Regional Planning Board, Appellants,

v.

UNITED STATES POSTAL SERVICE and Benjamin F. Bailar, United States Postmaster General, Appellees.

No. 1187, Docket 76–6065.

United States Court of Appeals, Second Circuit.

Argued June 15, 1976.

Decided Sept. 3, 1976.

Larry A. Stumpf, Goldstein, Goldman, Kessler & Underberg, Rochester, N.Y., for appellants.

Gerald J. Houlihan, Asst. U.S. Atty., Rochester, N.Y. (Richard J. Arcara, U.S. Atty. for the W.D.N.Y., Buffalo, N.Y., of counsel), for appellees.

Before SMITH, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal challenges the rather surprising Postal Service ruling that the construction of a $12 million postal facility in the town of Henrietta, New York, a suburb of Rochester, which construction contemplates the ultimate abandonment, in whole or in substantial part, of an older large facility in the city, is *not* a "major Federal actio[n] significantly affecting the quality of the human environment" within the meaning of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (NEPA). The appeal is also based on the failure of the Postal Service, in proceeding with this project, to consult with and consider the views of local planning authorities as appellants claim the Intergovernmental Cooperation Act, 42 U.S.C. § 4231(b) (ICA),[1] requires the Service

---

1. 42 U.S.C. § 4231(b) provides:

 All viewpoints—national, regional, State, and local—shall, to the extent possible, be fully

considered and taken into account in planning Federal and federally assisted development programs and projects. State and local

to do. The action was filed in the United States District Court for the Western District of New York by the City of Rochester and the Genessee-Finger Lakes Regional Planning Board, an eight-county planning board which is the designated clearinghouse for purposes of Office of Management and Budget Circular A–95.[2] The decision of the district court, Harold P. Burke, *Judge,* dismissed the complaint on a number of grounds, ruling that appellants lack standing, that their suit is barred by laches, that the claims of injury as to the abandonment of the main Post Office are "social" and "economic" rather than "environmental," that the Postal Service has fully complied with the requirements of NEPA, and that the Service is exempt from the requirements of the ICA. Judge Burke found specifically that the preliminary determination of the Postal Service that the construction of its new "mail facility" in the town of Henrietta (the HMF) would not significantly affect the quality of the human environment was not arbitrary, capricious or an abuse of discretion.

Since the appellants delayed in instituting suit until the construction project was well under way,[3] we affirm the judgment of the district court insofar as it refuses to enjoin further work at the Henrietta construction site. In all other respects, the judgment of the district court must be reversed.

The City's present Main Post Office (MPO) is located on Cumberland Street at the northern perimeter of the Rochester central business district, and is housed in a one- and two-story building of approximately 72,800 square feet. Rochester, a city of approximately 300,000 people, has already spent considerable sums (much by way of federal grant) to improve the adjacent central business district, by making certain highway system modifications and acquiring the old Penn Central Railroad terminal and its land; at least as of the beginning of 1976, the City was in the midst of preparing a new downtown development plan.

The Postal Service has determined that the city MPO is inadequate to handle anticipated mail processing needs. The Service is also of the view that the MPO has provided substandard working conditions for quite some time. As early as 1968 the Postal Service leased a building in the town of Henrietta,[4] some seven or eight miles from the city, for use as a sectional handling center. Approximately 300 employees were transferred at that time from the MPO to the leased Henrietta facility. In 1970, the Rochester Postmaster requested consideration of a plan to construct a general mail and vehicle maintenance facility to serve the entire Rochester metropolitan area. Over a four-year period the Postal Service determined that a new facility would be required and that a site of no less than 36

government objectives, together with the objectives of regional organizations shall be considered and evaluated within a framework of national public objectives, as expressed in Federal law, and available projections of future national conditions and needs of regions, States, and localities shall be considered in plan formulation, evaluation, and review.

2. The Office of Management and Budget Revised Circular A–95, 38 Fed.Reg. 32874–80 (Nov. 28, 1973), implements title IV of the Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4231 *et seq.,* and Section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), by establishing "areawide clearinghouses" to "aid in the coordination of Federal or federally assisted projects and pro-

grams with State, areawide, and local planning for orderly growth and development."

3. The district court found that at the time suit was brought (on January 14, 1976), 18 months after the site for the HMF was purchased, the new building, to consist of 366,000 square feet, was 18 per cent complete and, exclusive of the $1.6 million cost of the site, about $8 million had been spent.

4. The rent for the Henrietta "Sectional Center Facility," which employs 400 people and is located one mile from the HMF, is $127,893.69. This amount could be saved if the facility were moved to the HMF building now under construction.

acres was necessary. A large portion of this area was to be used exclusively for "vehicle maintenance" purposes. No site of that size was available inside the city, and it was finally determined by the Postal Service, without informing either the City of Rochester or the regional planning board, that the best available site for the new facility was in the town of Henrietta.

## I. Standing.

 The conclusion of the district court that neither the City of Rochester nor the regional planning board has standing to seek enforcement of NEPA and the ICA is out of harmony with settled law. Well-reasoned cases have uniformly held that a municipality has standing to challenge federal agency action resulting in environmental damage within the city. *See, e. g., City of Boston v. Volpe,* 464 F.2d 254 (1st Cir. 1972); *Town of Groton v. Laird,* 353 F.Supp. 344, 348 (D.Conn.1972). Similarly, a regional planning board which is designated under the ICA as the area-wide clearinghouse for regional planning, *see* 42 U.S.C. § 4231(b), (c), must be considered to have standing to seek review of federal projects in variance with the regional plan.

 Appellees urge, however, that the issue of construction of the new facility at Henrietta and abandonment of the old in Rochester are "entirely separate and apart." The Postal Service view is that there are no adverse environmental effects to the City of Rochester stemming from the construction in Henrietta, and that only the HMF construction decision is proper for review at this time.[5] There being no injury to Rochester or the regional planning board from the Henrietta construction, it is argued, the appellants lack standing to raise the NEPA claim regarding that construction. This reasoning, however, is insufficient. The Postal Service has admitted that

"the HMF is designed to accommodate all mail processing requirements of the metropolitan Rochester area. To effect this the USPS will transfer the job site of approximately 1400 employees from the [Rochester] MPO approximately seven miles to the HMF." Thus while construction of the new facility and termination of employment at, and potential abandonment of, *see* text accompanying notes 8, 9 and 10 *infra,* the old MPO are separable from the standpoint of construction, they are intimately related, interconnected so to speak, in terms of Postal Service usage. As will be discussed below, the environmental effects of the employee transfer may well be substantial, and their primary incident would be in the city of Rochester itself. Furthermore, the cases in this circuit and elsewhere have consistently held that NEPA mandates comprehensive consideration of the effects of all federal actions. 42 U.S.C. § 4332(2)(a). To permit noncomprehensive consideration of a project divisible into smaller parts, each of which taken alone does not have a significant impact but which taken as a whole has cumulative significant impact would provide a clear loophole in NEPA. *Scientists Institute for Public Information v. Atomic Energy Commission,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1086–87 (1973); *Conservation Society of South Vermont, Inc. v. Secretary of Transportation,* 343 F.Supp. 761 (D.Vt. 1972), *aff'd,* 508 F.2d 927 (2nd Cir. 1973), *judgment vacated and remanded on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *rev'd on other grounds upon remand,* 531 F.2d 637 (2nd Cir. 1976). The guidelines of the Council on Environmental Quality make it clear that the statutory term "major Federal actions" must be assessed "with a view to the overall, cumulative impact of the action proposed, related Federal action and projects in the area, and further actions contemplated." 40 C.F.R. § 1500.6(a) (1975).[6] The transfer

---

5. It should be noted that while Henrietta itself ultimately objected to the Postal Service plans, it is not a party to this litigation.

6. *Kleppe v. Sierra Club,* —— U.S. ——, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (EIS on use of federal coal reserves in Northern Great Plains

Region not required where there is no proposal for a regional development plan), is not to the contrary. The Court there stated:

We begin by stating our general agreement with respondents' basic premise that § 102(2)(C) may require a comprehensive impact statement in certain situations where

decision is plainly a consequential, if not an inseparable, feature of the construction project. Appellants therefore have standing in this case.

## II. NEPA.

■ A study labeled "Environmental Impact Assessment" (EIA) was prepared by the Postal Service consulting architects, but this study was not released to the general public and public input was not received. The EIA dealt only with the environmental effects of the construction and operation of the new HMF; no consideration whatever was given to the environmental effects associated with the contemplated abandonment in whole or in large part of the MPO and the attendant transfer of some 1,400 employees therefrom to the Henrietta facility.[7] While the Postal Service concedes that the proposed construction is a "major Federal action," the Service has concluded, in reliance on the EIA, that the construction does not "significantly affec[t] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

We disagree. There are a multiplicity of factors, some of which were mentioned in the EIA and several of which were not, which indicate that substantial environmental degradation may result from the challenged project. The EIA, note 7 supra, falls short of the type of reasoned elaboration which must be required to support an administrative determination of non-substantiality under the EPA. See, e. g., Silva v. Lynn, 482 F.2d 1282 (1st Cir. 1973); Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697 (2nd Cir. 1972).

■ More importantly, the Postal Service wholly neglected consideration of possibly major environmental effects associated with this project. The transfer of 1,400 employees alone could have several substantial environmental effects, including (1) increasing commuter traffic by car between the in-city residents of the employees and their new job site (only one bus route currently serves the HMF site; whether many current employees will find the HMF a more convenient work location is unknown); (2)(a) loss of job opportunities for inner-city residents who cannot afford or otherwise manage, to commute by car or bus to the HMF site, or (b) their moving to the suburbs, either possibly leading "ultimately [to] both economic and physical deterioration in the [downtown Rochester] community," cf. City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972) (three-judge court); and (3) partial or complete abandonment of the downtown MPO which could, one may suppose, contribute to an atmosphere of urban decay and blight, making environmental repair of the surrounding area difficult if not infeasible. See Trinity Episcopal School Corp. v. Romney, 523 F.2d 88, 93 (2nd Cir. 1975) (federal agency must

---

several proposed actions are pending at the same time. . . . A comprehensive impact statement may be necessary in some cases for an agency to meet this duty. Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.

Id. at ——, 96 S.Ct. at 2730.

**7.** The environmental factors mentioned in the EIA all pertain to the effects of the construction of the HMF on the Henrietta environment. They include (1) alteration of 36 acres of land consisting of "trees, some brush and shrub growth, and weed or grass vegetation" into a paved parking area of 14.3 acres and a building and appurtenances covering 8.9 acres; (2) inclusion of the 36-acre project into an area which, though industrially zoned, "is suburban in nature [with] the remaining open green spaces add[ing] to this effect"; (3) addition of thousands of car and truck transfers per day along a Henrietta street where noise levels have already reached 90 decibels, a level at which "prolonged exposure . . . can result in hearing damage"; (4) additional local traffic from operation and construction of the facility which "could cause degradation of ambient air quality"; (5) gasoline and oil drippings from the parking areas and maintenance facilities which may be washed into adjacent creek; and (6) the irrevocable destruction of "the habitat of the small animals the site now supports." The EIA, after superficial discussion of these adverse effects, merely concludes that none will be "significant."

consider impact of its actions on urban decay and blight and the city development planning).

The Postal Service contests the impact of only the latter of these three effects.[8] The Service maintains that it will continue some services at the MPO, and maintenance of the entire building, even after it transfers the bulk of the activities and employees from the MPO to the HMF. This position differs from that previously asserted by Mr. Kenyon, the General Manager of the Eastern Regional Real Estate Division of the Postal Service, who informed the appellants that the Postal Service would abandon the downtown building and attempt to sell it.[9] Even accepting, as did the district court, the current position of the Service that the MPO building will not be abandoned,[10] it is apparent that substantial issues of environmental importance have not been canvassed in the EIA. This, in combination with the importance of those factors concerning the environmental impact at the construction site which *were* discussed in the EIA, indicate that an Environmental Impact Study is required under 42 U.S.C. § 4332(2)(B), and should have been performed prior to initiation of the project. *See, e. g., Maryland-*

*National Capital Park and Planning Commission v. United States Postal Service,* 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973). In our view, therefore, the Postal Service has failed to comply with NEPA requirements.

### III. ICA.

■ In addition to the Postal Service's responsibilities under NEPA, it is our view that the ICA mandates that the Service give full consideration to "[a]ll viewpoints— national, regional, State, and local—" in planning Postal Service development projects, 42 U.S.C. § 4231(b), note 1 *supra.* The Postal Service argues that the ICA is inapplicable to it, despite the fact that § 101 of the ICA, 42 U.S.C. § 4201(1), specifically includes all federal instrumentalities and wholly owned corporations within the definitions of "Federal agencies" subject to the Act. It is apparent that the Postal Service, an "independent establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201, comes within the ICA definition. Nonetheless, the Service contends that it is exempt from the ICA under 39 U.S.C. § 410(a), which provides that the Service is not bound by any "Federal law dealing with public or Federal

---

8. The transportation impact generated by *operation* of the HMF was discussed, but only in terms of Postal Service vehicles. Nothing is said in the EIA about employee-commuter traffic or job site except:

> Dependent upon postal service hiring policies, jobs may be available to Town [*i. e.,* Henrietta] residents. The demographic and economic profiles indicate that Town residents are likely candidates for such jobs that would be available. Support services, such as restaurants, etc., might also benefit.

9. On September 10, 1975, Mr. Kenyon wrote Margaret Ely, associate planner with the Genessee-Finger Lakes Regional Planning Board, in part as follows:

> (d) In answering your question relative to the proposed disposition of the existing Postal facility, one must also consider that this is likely the real concern of the downtown area and perhaps the Chamber of Commerce. Whenever the Postal Service locates the Mail Processing Facility on the periphery of a community of the size of Rochester, it is *always conscious* of the fact that the downtown area must continue to have the same financial and customer services that it has

been accustomed to. A facility adequate to serve the downtown area will be available to the community. It will be an improved facility that will offer better service to the downtown community.

> The existing Postal-owned building most certainly will be surplus to the needs of the Service and as such will be offered for disposition under a standard procedure. Federal Government Agencies are solicited to determine whether or not they have a need. This is followed by an inquiry to the State, County, and local Government. If all have no interest in the building, it is then placed on the market for public bid.

10. While the current Postal Service statement of intent must be considered somewhat suspect in view of the prior, contrary statement by the area real estate manager for the Postal Service, *see* note 6 *supra,* the district court found that abandonment of the downtown building will not occur. The district court accepted the Service's averral that it will use about one-quarter of the MPO building as a downtown mail service center, and "properly maintai[n]" the building in its entirety. What this would mean in actuality was not covered in the EIA.

contracts, property, works, officers, employees, budgets, or funds . . . [11]

■ This immunity argument has been rejected in the analogous context regarding the applicability of NEPA to the Postal Service. *See Chelsea Neighborhood Associations v. United States Postal Service*, 516 F.2d 378 (2nd Cir. 1975). We believe the result should be the same here. As Judge Feinberg pointed out in *Chelsea Neighborhood*, the Postal Reorganization Act is "managerial" in orientation. 516 F.2d at 384. NEPA, on the other hand, and, we might add, ICA, are "policy-oriented." As in the case of NEPA, it is most unlikely that Congress had the recent, development-planning provisions of the ICA in mind as one of the "ancient accretions of 'legislative, budgetary, financial, and personnel policies that . . . [were] outmoded, unnecessary, and inconsistent with . . modern management and business practices,' " from which it wanted to exempt the Postal Service. 516 F.2d at 384, *quoting* H.R.Rep. No. 91–1104, 91st Cong., 2nd Sess. 2 (1970). The declared purpose of the ICA is to set forth a policy recognizing the importance of the sound and orderly development of all areas within the nation, both urban and rural, and to provide "as a matter of congressional policy, that agencies, to the extent possible, will take into account all viewpoints—national, regional, State and local—in the formulation and administration of [federal and federally assisted] projects." H.R.Rep. No. 1845, 90th Cong., 2nd Sess. (1968), 1968 U.S.Code Cong. & Ad.News, pp. 4226–27. *See also Conservation Society of Southern Vermont, Inc. v.*

*Secretary of Transportation, supra*, 362 F.Supp. at 638. The ICA is a new developmental policy, passed by the Congress in October, 1968, only three months before the genesis of the Postal Reorganization Act. *Cf. Chelsea Neighborhood, supra*, 516 F.2d at 384. The Act simply cannot be characterized as one of the outmoded managerial statutes which the Postal Service was intended to be freed from by Section 410. Common sense as well as statutory history supports this understanding of the ICA; one should suppose, in the abstract, that the principal aim of the Postal Service being to serve the needs of people spread over the entire country, cooperation with regional or intergovernmental planning agencies would be an important objective for it as a responsible federal instrumentality.[12] We conclude, therefore, that the Service must comply with the ICA requirements, unless we read the ICA as an exercise in meaningless legislative futility.

■ We prefer to read the ICA as constituting a meaningful national recognition that the objectives of state and local governments and their planning agencies should, "to the extent possible," be incorporated into the federal decisionmaking process, 42 U.S.C. § 4231(b). Necessarily phrased in broad terminology, the ICA contemplates for federal consideration, among other matters, "all developmental aspects of our total national community, including but not limited to housing, transportation, economic development, natural and human resources development, community facilities, and the general improvement of living envi-

11. 39 U.S.C. § 410(a) provides, with exceptions not here pertinent, that "no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds . . . . shall apply to the exercise of the powers of the Postal Service."

12. The Postal Service, to some degree, has recognized its responsibility in this area. While its regulations incorrectly state that NEPA and other environmental acts do not apply to it, 39 C.F.R. § 775.1(b) (1975); *see Chelsea Neighborhood Associations v. United States Postal Service*, 516 F.2d 378 (2nd Cir. 1975), the regulations do go on to say that

it is the policy of the Postal Service to comply voluntarily with such statutes, orders and regulations (including all State and local requirements *made applicable to Federal agencies by virtue of, or pursuant to, Federal statutes*) to the extent practical and feasible consistent with the public interest and fulfillment of the primary mission of the Postal Service.
39 C.F.R. § 775.1(b) (1975). The regulations also treat consultation with the regional clearinghouses as "advisable." *Id.* § 775.6(a).

ronments." 42 U.S.C. § 4231(c).[13] These are precisely the considerations which appellants claim the Postal Service has failed to take into account, either by itself or in conference with the local planning agencies as they contend the statute requires.

The Postal Service argues, to the contrary, that it has substantially complied with the ICA because that Act requires only that local and regional viewpoints "shall to the extent *possible*, be fully considered and taken into account in planning Federal . . . projects." 42 U.S.C. § 4231(b) (emphasis added by appellee). The Service seriously urges that its specific contacts with the City of Rochester and representatives of several towns constitute compliance "to the extent possible." Those contacts, however, consisted principally of a trip by Milford C. Beers, a realty specialist with the Department of Army Corps of Engineers which was engaged by the Postal Service to perform real estate and engineering functions under an order by the Office of Management and Budget. Mr. Beers made a trip to Rochester and a survey of the area by stopping in at the City's assessor's office and the Town assessor's office and the towns of Gates, Brighton and Henrietta. The Assistant Postmaster General, Real Estate and Buildings Department, was also in contact with the Rochester mayor and county manager. On March 15, 1974, at the request of Rochester city officials he attended a meeting with the Rochester city manager at which it was established that there was no site offered by the City which would meet the Postal Service's 36 acre requirement.

But this falls far short of indicating that the Postal Service did anything to promote the purposes of, or to comply with the language of, the ICA. While the ICA does not expressly provide that the Postal Service necessarily must confer with, much less incorporate the views of, local planning agencies regarding its development decisions, it does require that the local views be "fully considered" for the purposes of "plan formulation, evaluation, and review." 42 U.S.C. § 4231(b). Nothing in the record before us indicates that the Service gave full consideration to the interests of the local agencies, all of which have rejected the current development plan. Under the ICA, as in the case of NEPA, the agency has an affirmative obligation to develop a reviewable record, including a list of the factors which support its decision to act in disharmony with local planning objectives, so that a reviewing court can determine whether the agency has acted arbitrarily or capriciously in claiming it has fully considered, but rejected, local planning objectives. *See Harlem Valley Transportation Association v. Stafford*, 500 F.2d 328, 337 (2nd Cir. 1974). This obligation has not been fulfilled by the Service.

*IV. Laches.*

The Postal Service's failure to comply with NEPA would ordinarily in and of itself be sufficient to require preliminary injunctive relief. *See Hanly v. Mitchell (Hanly I)*, 460 F.2d 640 (2nd Cir.), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1974); *Hanly v. Kleindienst (Hanly II)*, 471 F.2d 823 (2nd Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). This is true at least

**13.** 42 U.S.C. § 4231(c) provides:

To the maximum extent possible, consistent with national objectives, all Federal aid for development purposes shall be consistent with and further the objectives of State, regional, and local comprehensive planning. Consideration shall be given to all developmental aspects of our total national community, including but not limited to housing, transportation, economic development, natural and human resources development, community facilities, and the general improvement of living environments.

While the provisions of this subsection are not precisely applicable to the present case, because they specifically relate to "Federal aid for development purposes" rather than to federal projects generally, we consider the elaboration of "developmental aspects" in § 4231(c) as a valuable referent to construction of the scope of the term "State and local government objectives, together with the objectives of regional organizations" as the latter appears in § 4231(b).

where there is imminent and irreparable harm threatened and the action is likely to have direct, tangible consequences of an environmental character. *See Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 499 F.2d 502, 511 (1974), *cert. denied*, 423 U.S. 937, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975). The record in this case supports an indication that the threatened injury stemming from construction of the HMF and relocation of the MPO employees is irreparable in its potential effects on the physical well-being at least of Rochester, if not of Henrietta. Accordingly, it would have been proper for the district court to order an injunction against the construction and transfer decisions, absent laches.

The district court, however, ruled that since this suit was not filed by appellants until January 14, 1976, when construction of the HMF was 18 per cent completed, *see* note 3, *supra*, and since appellants are chargeable with knowledge of the Service's decision in this matter as of a far earlier date, the suit should be barred for laches. The view of the district court was that "[t]he cost of abandoning or altering the proposed project outweigh [sic] any benefits that might accrue to the general public [from the proposed injunction]." While laches is a doctrine of equity that is only rarely invoked in environmental cases, *but see East 63rd Street Association v. Coleman*, 414 F.Supp. 1318 (S.D.N.Y.), *aff'd by order*, 538 F.2d 309 (2nd Cir. 1976), on account of the strong public interest in effecting compliance with NEPA, *Steubing v. Brinegar*, 511 F.2d 489, 495 (2nd Cir. 1975), we are reluctantly forced to conclude that the appellants are barred from enjoining the construction of the new Henrietta facility.

Both the City of Rochester and at least one member of the board of directors of the planning board knew of the Postal Service plan to relocate the area's major postal facility outside of Rochester as early as March 1974. The Postal Service announced in June of 1974 that it had "agreed to purchase" the Henrietta site and the commencement of construction of the facility was announced in August, 1975, in the newspaper. Several months of correspondence then went by before this action was commenced by the appellants. To be sure, the City of Rochester repeated its demand that an environmental impact statement be prepared on August 8, 1975, as soon as it heard "the shocking news of the award of contracts for construction . . ." At the very same time, the planning board requested information and demanded an A-95 review. But it was not until November, 1975, that the City and the planning board contemplated legal action. On November 19, 1975, the planning board, after receiving comments disapproving the Postal Service's plans from the Town of Henrietta, the County of Monroe Department of Planning and the Rochester City Planning Commission communicated its disapproval to the Postal Service. Suit was finally filed on January 14, 1976, when construction was 18 per cent completed. We were advised at the time of argument that construction is currently about 35 per cent complete.

Thus, during the delay that occurred prior to suit and after notice of the Postal Service's intention to proceed with the Henrietta project, construction has proceeded to a point where it is impractical for economic reasons to enjoin further development of the Henrietta site. We would surely have the power to enjoin further construction if it appeared that such a stay, pending preparation of the required EIS, would best serve the public interest. *Steubing v. Brinegar, supra.* But we are not persuaded that the further construction, in and of itself, will create such an adverse environmental impact, beyond that already incurred by partial construction, as to override the public interest in averting the economic waste—involving penalties under or renegotiation of the construction contract—entailed from a mid-stream termination of that contract. *Compare Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 539 F.2d 824, 843 (2nd Cir. 1976).

We therefore affirm that portion of the district court's opinion denying a preliminary injunction against further construction of the HMF.

## V. Relief.

 It remains our view, however, that the construction at the Henrietta site in conjunction with the transfer of employees to that location has substantial environmental effects which must be explored by the Postal Service by means of an environmental impact study. While much of the environmental damage may be "water over the dam" in the view of the application of laches to the construction project itself, there remain for further study the effects of the planned use of the new facility on the Henrietta environment and of the transfer of the MPO employees on the Rochester and regional environments (through increased commuter traffic, impediment of downtown redevelopment opportunities, etc.). In studying these effects, the Postal Service will want to consider alternative uses of the HMF building, in whole or in part, which may alleviate a portion of the threatened environmental harm still impending under the remaining steps of the transfer plan. Similarly, alternative provisions should be considered for use of the downtown facility should the planned departure of the MPO employees be carried through. Commuter assistance planning for inner-city employees should be treated as a possible alternative means of combating single-car commuting, and as a method of facilitating job continuation by inner-city residents. There are, no doubt, a number of other alternatives for alleviating remaining adverse environmental impacts of the MPO–HMF project, and transfer, which should properly be developed in a publicly available study by the Service.

Rather than attempting arbitrarily to divide the environmental injury involved in this project into "past" and "future" injury,

a division which could unnecessarily stifle creative consideration of the remaining problem of minimizing environmental damage at the construction site itself, we believe the proper course for the Service to take is to prepare an EIS as if the construction decision (and activity) had not as yet taken place; only the location of the construction site itself need be deemed fixed. This will allow the Service to review, in addition to the urban/regional factors previously mentioned, any remaining alternatives for minimizing damage to the Henrietta site by way of modification of the site, of the building, or of the means by which the building is utilized. It seems most unlikely that construction planned wholly without benefit of the thoughtful probing of environmental issues contemplated by NEPA will have achieved the best practicable solution to minimizing environmental damage at the construction site, but perhaps some useful alternatives may still be available.

In accordance with the above, it is the judgment of this court that appellee should be preliminarily enjoined, pending the preparation and filing with the district court of an environmental impact statement which sufficiently examines alternatives and complies fully with other NEPA requirements, from the transfer of mail processing activities or Postal Service employees from the Rochester Main Post Office to the Henrietta Mail Facility.[14] Since the Postal Service is evidently committed in a very real sense to the movement of its facilities and the transfer of its employees to Henrietta, there is danger that an after-the-fact EIS such as we are ordering could result in pro forma, automatic reconfirmation of the presently contemplated plan. Our order is intended, however, to ensure that the agency does more than give the present plan rubber-stamp approval. The agency must at least take a "hard look" at the environmental consequences and alternatives,

---

**14.** This order will not deprive the service of all economic use of the HMF pending completion of the EIS because it does not prevent transfer to the HMF of the 400 employees presently located in rented space at the Henrietta sec-

tional handling center, note 4 supra. No one has objected to this transfer or suggested that it is a major federal action with substantial environmental effects, 42 U.S.C. § 4332(2)(c).

*Kleppe v. Sierra Club,* —— U.S. ——, 96 S.Ct. 2718, 49 L.Ed.2d 576 n.21 (1976); it must not act arbitrarily or capriciously in its decisionmaking process, *Hanly II, supra.*

Our opinion should aid the Postal Service in its effort to determine how best to meet the demands of NEPA in evaluating the contemplated removal of facilities from the central city. The input of the appellants' planning agencies, moreover, may permit some reconciliation between local goals and federal planning, in an effort to achieve the most satisfactory solutions to the problems such major federal action engenders. It is our judgment, then that appellee be, and it hereby is, preliminarily enjoined from transferring mail processing activities or Postal Service employees or their positions from the Rochester Main Post Office to the Henrietta Mail Facility pending compliance with NEPA and the ICA.

Judgment shall accordingly be entered in accordance with this opinion, with costs to neither party.