**SIERRA CLUB, et al., Plaintiffs,**

v.

**James M. SIGLER, et al., Defendants.**

**Civ. A. No. G–81–142.**

United States District Court,
S. D. Texas,
Galveston Division.

Feb. 3, 1982.

---

Frederick S. Middleton, III, Washington, D. C., James T. B. Tripp, New York City, Adrian L. Young, Galveston, Tex., for plaintiffs.

Margaret Strand and Pauline H. Milius, Dept. of Justice, Washington, D. C., for federal defendants.

Charles T. Newton, Jr., and Charles L. Berry, Vinson & Elkins, Houston, Tex., for defendant Pelican Terminal Co.

Benjamin R. Powel, McLeod, Alexander, Powel & Apffel, Galveston, Tex., for defendant City of Galveston.

## MEMORANDUM AND ORDER

HUGH GIBSON, District Judge.

The Sierra Club, vanguard of a coalition of environmentally concerned non-profit corporations,[1] brought suit to challenge the issuance by the United States Army Corps of Engineers (Corps) of five permits authorizing the private construction of a "multipurpose deepwater port and crude oil distribution system" at Galveston, Texas. Under the auspices of section 10(e)(2) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), plaintiffs challenge the agency decisionmaking process involved here as violative, *inter alia*, of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the Fish and Wildlife Coordination Act (FWCA), 16 U.S.C. § 661 *et seq*, section 404 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1344, section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, and

---

1. Plaintiffs consist of the Sierra Club, the Environmental Defense Fund, Inc. (EDF), the Galveston Bay Conservation and Preservation Association, the Gulf Coast Fishermen's Environmental Defense Fund, and the Texas Environmental Coalition.

various federal regulations governing the activities of the Corps. Suit was filed against the federal defendants [2] on May 19, 1981. The permit applicants, Pelican Terminal Company (PELCO) and the City of Galveston, through the Galveston Wharves, intervened as defendants shortly thereafter.

The central thrust of plaintiffs' case concerns the Corps' compliance with the procedural strictures of federal law, principally NEPA and the FWCA, in the agency decisionmaking process. Plaintiffs present a manifold challenge to the adequacy of the final environmental impact statement (FEIS) required by NEPA. Plaintiffs also assail the adequacy and good faith of the Corps' coordination efforts with the U. S. Fish and Wildlife Service (FWS), contending that it was violative of both NEPA and the FWCA. It is alleged that officials of the FWS and the Department of the Interior (DOI) defaulted on their FWCA obligation to prepare a formal written report for incorporation into the FEIS, that the Corps defaulted on its obligation to include such a report in the FEIS, that high ranking officials in FWS and DOI improperly quashed efforts of local FWS officials to submit further comments concerning the FEIS subsequent to publication, and that the Corps improperly refused to consider these comments.

The case came before the Court for hearing on October 21, 1981. During the seven days of hearings, numerous exhibits were introduced to supplement the already voluminous administrative record of the case, and plaintiffs offered live testimony of eleven witnesses, including the agency decisionmaker, Colonel James M. Sigler, representatives of PELCO, the Wharves, the Texas Offshore Port project (TOP),[3] and experts in environmental, economic, and energy-related fields. At the conclusion of the hearing on October 28, 1981, the Court directed the parties to file post-trial briefs. Final arguments were held on December 4, 1981. Having reviewed the administrative record, the further evidence adduced before the Court, and having considered the memoranda, briefs, and arguments of counsel,[4] the Court now enters this Memorandum and Order pursuant to Fed.R.Civ.P. 52.

## I.

## BACKGROUND

On July 8, 1980, Colonel James M. Sigler of the U. S. Army Corps of Engineers issued five permits authorizing the private construction of an onshore deepwater port and crude oil terminal at Galveston, Texas. The decision concluded some two and a half years of agency review of the proposed action under NEPA. The permitted project entails the deepening and extending of the existing Galveston Harbor and Channel to allow very large crude carriers (VLCCs) of up to 250,000 deadweight tons (dwt) to offload their cargo at the Port of Galveston. The project contemplates the construction of a crude oil tanker berthing and offloading facility on Pelican Island, and a crude oil pipeline distribution system linking the

2. Sued in their official capacity were James M. Sigler, District Engineer, United States Army Corps of Engineers, Galveston District; Joseph K. Bratton, Chief of Engineers, Department of the Army; James G. Watt, Secretary of the Interior; F. Eugene Hester, Director, United States Fish and Wildlife Service (FWS); and David M. Harris, Field Supervisor, Galveston Field Office, FWS. Hester and Harris no longer hold these positions.

3. TOP applied for a license with the Department of Transportation (DOT) in December 1980. A license was issued in September 1981. TOP's sponsors have not determined whether they wish to proceed with the project under this license or not. They have until June 1982 to reach a decision.

TOP is a scaled down successor to the Texas Deepwater Port Authority (TDPA) proposal, involving an offshore project near Freeport, Texas. The FEIS, which was published in September 1979, considered TDPA in its discussion of alternatives to the proposed action. In fact, the FEIS relied rather heavily on a DOT report prepared pursuant to section 4(d) of the Deepwater Port Act of 1974, 33 U.S.C. § 1503, evaluating the TDPA proposal and comparing it with the Galveston proposal. See COE R.Vol. 23.

4. In addition to the briefing done by the parties, the Court granted leave to the National Wildlife Federation to file an amicus brief with respect to the FWCA issues in the case. That brief supports plaintiffs' positions.

Pelican Island terminal with storage facilities at Texas City, Beaumont, Houston and Freeport. The deepening of Galveston Channel will also make possible extended use of larger vessels in other trade at the Port, such as bulk commodities.

From the beginning the project has sparked vehement controversy. Opposition focused upon the potential impact of a major oil spill upon environmentally sensitive areas of Galveston Bay. The possibility of a massive tanker oil spill in the Bay, if not the most significant concern associated with the project, has clearly been the most visible one.

The spectre of a major oil spill in Galveston Bay, however, has preceded by several decades the vision of a deepwater port at its outer perimeter. The area has long been a thriving center of maritime commerce along the Texas coast, and the petrochemical industry has provided a major catalyst to that activity. Indeed, the nation's largest concentration of refineries and petrochemical plants is located within a crescent running from Freeport to Galveston to Beaumont, and crude-carrying vessels ranging from 50,000 dwt to 150,000 dwt frequent the navigable waters of the area. More than 2,000 tankers annually enter the Galveston Entrance Channel enroute through Galveston Bay to the ports of Texas City and Houston. Approximately one-third of these vessels have drafts of 36 feet or greater.

As the federal defendants note, then, the project does not threaten a pristine waterway or introduce a significantly new type of environmental risk into the commercial activity of the Bay. It will introduce into the commercial activity of the area, however, the presence of deep draft VLCCs of up to 250,000 dwt in close proximity to environmentally sensitive estuarine waters of the Bay, portending an oil spill more massive in scope than heretofore possible. At present, the largest spill associated with a single-tanker casualty that could conceivably threaten environmentally sensitive Bay areas would involve approximately 28,000,000 gallons of oil. An oil spill associated with the project could involve up to 49,000,000 gallons of oil.[5]

Essentially, it is the Corps' assessment in the FEIS of the probability of such an occurrence and the likely environmental impacts that would follow, when balanced against the utility of the project, that plaintiffs challenge. In his decision of June 8, Col. Sigler found that a balance was struck in favor of the development of the project and the issuance of the permits in question. Plaintiffs' array of challenges to the decisionmaking process involved here ultimately aim at a single conclusion: that the Corps' findings and conclusions, when subjected to judicial scrutiny under the scope of review set forth in section 10(e)(2) of the APA, is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law," [6] and thus must be set aside.

## II.

## CHALLENGES TO AGENCY DECISIONMAKING UNDER NEPA

### A. The Scope of Review

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires federal agencies, such as the Corps of Engineers, to prepare a "detailed statement" whenever they propose "major Federal actions significantly affecting the quality of the human environment." By requiring an impact statement, Congress intended to ensure that federal

---

**5.** These figures are derived from a 33% lightened 150,000 dwt vessel and a 30% lightened 250,000 dwt vessel. The 150,000 dwt vessel is the largest tanker presently utilizing the Inner Bar Channel. The prevalent tanker in the Galveston Bay area, however, is the 50,000 dwt class. The volumes of spillage in the text assume a total cargo loss. *See* COE R.Vol. 8, at 8–79 (response to comments of DOI to FEIS, May 20, 1980). In citing these spill volumes,

the Court expresses no opinion as to the probability for such an occurrence. It merely points to theoretical possibilities.

**6.** 5 U.S.C. § 706(2)(A). The APA also provides that an agency decision shall be set aside if found to be "without observance of the procedure required by law." *Id.* § 706(2)(D). *See Citizens for Mass Transit, Inc. v. Adams*, 630 F.2d 309, 313 (5th Cir. 1980).

agencies consider the environmental impact of their actions in the decisionmaking process. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976); *South Louisiana Environmental Council, Inc. (SLEC) v. Sand*, 629 F.2d 1005, 1010 (5th Cir. 1980). To ensure that the effects of a project on the environment do not go unnoticed by a federal agency or the public at large, NEPA requires a discussion in the EIS of (1) the environmental impact of the proposed action, (2) any unavoidable adverse environmental effects, (3) alternatives to the proposed action, (4) the relationship between the short-term uses and long-term productivity of the environment, and (5) any irreversible and irretrievable commitment of resources occasioned by the proposal. 42 U.S.C. § 4332(2)(C)(i–v).

■ While NEPA sets forth significant substantive goals for the nation, its mandate to decisionmaking agencies is essentially procedural. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The role of the reviewing court is similarly limited. Once an agency has followed NEPA's procedural requirements to a decision, the only role for a court is to ensure that the agency has considered the environmental consequences as Congress intended. *Stryker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980); *SLEC v. Sand, supra*, at 1009–10.

■ The Fifth Circuit has articulated three criteria for determining the adequacy of an EIS: (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action; (2) whether the EIS provides details sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS exploration of alternatives is sufficient to permit a reasoned choice among the different courses of action. *See Isle of Hope Historical Association, Inc. v. United States Army Corps of Engineers*, 646 F.2d 215, 220 (5th Cir. 1981) (adopting opinion of district court). Ultimately, the court's task is to

determine whether the EIS would permit a decisionmaker to consider and balance the environmental factors fully. *Citizens for Mass Transit, Inc. v. Adams*, 630 F.2d 309, 313 (5th Cir. 1980); *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975). Compliance with NEPA's procedural requirements is to be judged against a "rule of reason," however, *Sierra Club v. Morton, supra*, at 819, and once the reviewing court determines that the agency has satisfied NEPA by taking a "hard look" at the environmental consequences of its actions, the court cannot interfere with the agency decision made within its statutory discretion. *Kleppe v. Sierra Club, supra*, 427 U.S. at 410 n.21, 96 S.Ct. at 2730. Thus, the function of the federal court under NEPA is to determine whether a plaintiff has established by a preponderance of the evidence, rather than by a *prima facie* showing of deficiencies, that the EIS was inadequate. *Isle of Hope, supra*, at 220; *Sierra Club v. Morton, supra*, at 818.

Plaintiffs submit that the instant FEIS fails because it does not adequately discuss and consider (1) the environmental value of Galveston Bay; (2) the environmental impact of a major oil spill associated with the proposed action; (3) the cumulative environmental impact of related projects; (4) the alternative of an offshore deepwater port and crude terminal, and (5) the economic justifications for the proposed action. Plaintiffs also contend that the Corps failed to comply with section 102(2)(C)'s requirement that the decisionmaking agency consult with and obtain the comments of concerned federal agencies prior to issuing an EIS because it did not obtain a formal report from the FWS for incorporation into the FEIS or consider additional comments of local FWS officials prepared subsequent to publication of the FEIS.

## B. The Present Environment

■ Plaintiffs contend that the FEIS grossly understated the environmental significance of Galveston Bay and its resources. The plaintiffs presented expert testimony at the hearing to establish at

great length the importance of the Bay's estuarine ecology to wildlife and marine resources. Plaintiffs argue that the discussion of these environmental concerns in the FEIS is so vague and nonspecific that it fails as the "detailed statement" of environmental consequences required by section 102(2)(C).

Plaintiffs' attack is hypercritical. The FEIS devotes an 85-page chapter to the discussion of the affected environment.[7] Studies identifying and documenting resources in Galveston Bay are provided as appendices to the FEIS and are summarized in the document. The discussion of resources in the FEIS includes terrestrial and marine vegetation, phytoplankton and zooplankton, benthic populations, nekton, fisheries, wildlife, and identified threatened or endangered species. The FEIS discusses the general physical and ecological impacts of an oil spill on the environment and the impacts of oil spills on particular resources.[8]

In considering the FEIS's discussion of the present environment in the broader context of the statement's consideration of the environmental impacts of the port project, this Court must determine whether the discussion is adequate to demonstrate that the Corps has taken a good faith objective "hard look" at the environmental consequences of its proposed action. *Kleppe v. Sierra Club, supra,* 427 U.S. at 410, 96 S.Ct. at 2730; *Isle of Hope, supra,* at 220. The

Court's analysis must proceed under a "rule of reason." *Sierra Club v. Morton, supra,* at 819. The FEIS's discussion of the ecology and resources of Galveston Bay demonstrates the Corps' consideration of the environmental consequences of its proposed action under this standard, *see Stryker's Bay, supra,* 444 U.S. at 227, 100 S.Ct. at 499, and plaintiffs have failed to establish otherwise by a preponderance of the evidence.

### C. Oil Spill Analysis: Worst Case or Average Effort

Plaintiffs assert that the FEIS discussion of the potential impacts and probabilities of a major oil spill associated with the proposed action is both inadequate and misleading. On the basis of the discussion contained in the FEIS, plaintiffs submit that a decisionmaker could not fully and fairly consider and balance the environmental factors at hand. *See Sierra Club v. Morton, supra,* at 819.

■ The oil spill analysis contained in the FEIS consists of three major components: (1) a probability analysis, (2) a dispersion model, and (3) an environmental impact analysis.[9] The general conclusion drawn is that the probability and likely environmental impacts of a major oil spill associated with the proposed action would not be significantly greater than at present.

---

7. FEIS Vol. 1, §§ 3.0 to 3.2.10.2.1.

8. *Id.,* § 4.2.5 to 4.2.6.6.2; FEIS app. E through I.

9. FEIS Vol. 1, § 4.1 to 4.2.10. *See generally* FEIS app. D through I. *See also* COE R. Vol. 8, at 78–81 (Response to DOI comments on FEIS). In this communication Sigler informed DOI of the results of further oil spill evaluation by the Corps utilizing the dispersion model contained in the FEIS. Over an initial 24-hour period, the Corps compared the projected area of coverage of a spill involving 12% of the cargo of a 33% lightened 150,000 dwt tanker and 12% of the cargo of a 30% lightened 250,000 dwt tanker, and found the difference in areal coverage to be slight. It is apparent that Sigler relied in part upon this information in concluding that the potential impacts of a major "with project" spill would not be significantly greater than a major "without project" spill. This information is not, in fact, a part of the FEIS, although the impact statement provides the analytical basis for the study. The Court has considered whether it properly may consider matters in the administrative record outside the FEIS in considering the agency decisionmaking process under NEPA, and is persuaded by a substantial body of case law that it may, at least where further discussion in the administrative record is intended to elucidate and eliminate legitimate doubt concerning the extensiveness of initial discussion in the FEIS, and elements of information withholding and *post hoc* rationalization are not readily apparent. *Piedmont Heights,* 637 F.2d 430 at 438, 440 (5th Cir. 1980); *North Slope Borough v. Andrus,* 642 F.2d 589, 603–604 & n.78 (D.C.Cir.1980); *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1384 (2d Cir. 1977). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The FEIS found that the conversion from conventional tankers to VLCCs in connection with the project would reduce overall tanker traffic in Galveston Bay because fewer tankers would be required to transport a given quantity of oil. The FEIS found that implementation of the proposed action would substantially decrease the number of vessel trips per year by conventional tankers that navigate Galveston Bay en route to Houston and Texas City—that this decrease would be offset by VLCC traffic in Galveston Channel, but that a net overall reduction in tanker traffic would result. This, the FEIS concluded, would reduce the overall probability of an oil spill in Galveston Bay, while creating a new risk of an oil spill in Galveston Channel, where tanker traffic presently is non-existent.

In assessing the probability and likely impacts of a major oil spill, the FEIS also considered statistical data concerning the correlation between spill frequency and tanker size; spill frequency and number of ports of call; spill size and tanker size; and expert assessment of this data. Consideration of spill frequency data in conjunction with the projected decrease in overall tanker traffic led the FEIS to conclude that the proposed action would not increase the probability of a major oil spill in Galveston Bay. The spill size data indicated the lack of any positive correlation between spill size and vessel size. Also discussed and considered in evaluating the likely impacts of a major oil spill was data addressing major causes of tanker casualties, the geographic characteristics of the Bay and the likely effectiveness of mitigation, containment, oil clean-up and traffic control measures.[10]

Plaintiffs challenge the validity of the FEIS's probability analysis and conclusions through expert testimony. Generally, the selection of data for incorporation into an environmental impact statement is within the discretion of the decisionmaking agency. *See SLEC v. Sand, supra,* at 1014. The agency's discretion, however, is not without bounds; the governing statute defines its limits. *See Environmental Defense Fund v. Marsh,* 651 F.2d 983, 1002–03

(5th Cir. 1981). Thus, selection of data that preempts a hard look at the environmental consequences of a proposed action or precludes full consideration and balancing of relevant environmental factors by the decisionmaker is violative of NEPA. *Isle of Hope, supra,* at 220; *Citizens for Mass Transit v. Adams, supra,* at 313. That is not the case here. The testimony of plaintiffs' experts establishes that equally reliable means of assessing oil spill probabilities do exist. Arguably, other methods of assessing probabilities might be preferrable, and different conclusions drawn. At most, plaintiffs have demonstrated only a divergence of viewpoints among experts. The standard of review under NEPA demands judicial deference to the expertise of the decisionmaking agency unless overborne by substantial and credible evidence of arbitrary or capricious action. *SLEC v. Sand, supra,* at 1014.

The probability analysis contained in the FEIS does not consider a single oil spill of any specific size. It is indeed an "average effort." The analysis is combined with a discussion of the environmental impacts of an oil spill upon the wildlife and resources of Galveston Bay, which, like the probability analysis, is not referenced to any particular volume of spillage. Included is a computerized dispersion model which predicts the fate of an oil spill occurring at a given location in the Inner Bar Channel, considered by the authors of the FEIS to be a "worst case" location due to its proximity to Galveston Bay.

Plaintiffs contend that this is not the "hard look" required and that the FEIS is fatally flawed by its "total failure" to consider environmental effects of a tanker casualty involving substantially all of the cargo of a 250,000 dwt VLCC. The dispersion model is criticized as irrelevant and misleading with reference to such a massive spill.

This latter criticism is not devoid of merit. The computerized dispersion model is an attempt to assess "the fate of an oil spill" occurring in the Inner Bar Channel, *i.e.,* the

10. Refer to Notes 21 to 23 and accompanying text *infra.*

areas of Galveston Bay potentially effected by the spill.[11] To the extent that the dispersion model reflects a hard look at this environmental consequence, it is one whose range of vision is quite limited. Apparently the model assumes a spill of 18,717 gallons, an average size spill in U.S. waters, and predicts the path of the spill over a single tidal cycle of approximately 24 hours. Although the FEIS recognizes that the area impacted by an oil spill would vary in relation to the size of the spill,[12] no effort is made to apply the dispersion model to various size spills as a basis for comparison.[13] Nor is the fate of any size spill projected beyond a 24-hour period.[14]

The chief utility of the dispersion model, a utility not expressly articulated in the FEIS, is its capacity to inform the statement's reader and the agency decisionmaker of the effect that currents and prevailing winds will have on the spread of any oil spill in the Inner Bar Channel over an initial 24-hour period. The model also points out that any significant spill in the Channel area will have severe impacts in an area where the FEIS found the proposed action would create a significant new risk of an oil spill. Beyond this, however, the dispersion model's analysis of the potential effects of an oil spill in the Inner Bar Channel on various areas of Galveston Bay, while not inherently misleading, is sharply limited in scope.

What is potentially misleading is the prominent place given the dispersion model in the summary provided by the authors of the FEIS to the oil spill analysis section. Section 4.2.10.2 of the FEIS concludes:

> 4.2.10.2 The effects of *any spill* which might occur in the inshore or offshore area were analyzed based on the use of a model to predict the fate of the oil and on existing literature concerning the effects on different habitats. It is predicted that although any substantial spill might have a severe local impact, the impact within Galveston Bay or along the Texas Gulf Coast would be minor and that impact would be reduced by prompt and adequate clean-up measures.

(Emphasis added). A moderately attentive reader of the FEIS would readily perceive that the dispersion model did not analyze the effects of any spill which might occur in the inshore area, other than as indicated above. The extent to which the dispersion model is a basis for the prediction that "any substantial spill" would have a severe local impact but minor impact within Galveston Bay or along the Texas Coast is unclear. The model provides no rational basis for that conclusion, however, unless it is assumed that containment and clean-up measures would totally curtail the spread of the spill within 24 hours of its occurrence. Significantly, the section considers the effect of prompt and adequate clean-up measures in addition to, but not as a basis for, this prediction of impacts.

Section 4.2.10.2 potentially could lead to the erroneous conclusion that the adverse environmental effects of "any spill" associated with the proposed action which occurred inshore would be limited to the area

---

**11.** *See* FEIS app. D, at D–II–55.

**12.** *See* FEIS Vol. 1, § 4.2.3.4.

**13.** *But see* COE R. Vol. 8, at 78–81. Refer to Note 9 *supra.*

**14.** Sigler testified at the hearing that attempts to use the dispersion model to analyze the fate on an oil spill beyond the initial tidal cycle proved "uninformative." The Court has searched in vain, however, for any confirmation of this testimony in the administrative record. While the Fifth Circuit has recognized that decisionmakers in an agency in limited circumstances may explain their actions through testimony, the Court certainly would be remiss if it gave controlling weight to testimony raising substantial concerns of "*post hoc* rationalizations," *i.e.*, concern that an agency decision will be made without regard to environmental effects and afterwards the agency will attempt to justify its position. *Piedmont Heights, supra,* at 440. Plaintiffs have not challenged Sigler's assertion, and in the overall context of the agency's decisionmaking process the possibility of *post hoc* rationalization does not appear great. Nevertheless, the Court does not believe that it should assign to Sigler's testimony in this regard the deferential weight it would afford to a contemporary statement of the decisionmaker in the administrative record. It accepts Sigler's testimony as plausible.

portrayed in Figure 4.2–3 of the impact statement.[15] In this case, however, the decisionmaker was not misled. In his decision document of June 8, 1980, Sigler observed that a major oil spill associated with the project could affect large portions of the Gulf beaches as well as Galveston Bay and its associated wetlands.[16] Sigler recognized that, depending on the amount of oil involved and other relevant variables, the effect of an oil spill upon environmentally sensitive areas of Galveston Bay might range from minor to severe.[17] Ultimately, he noted that the threat of a major oil spill was not a new hazard that would be introduced to the area by the proposed action, and found that the impact of a major oil spill associated with the largest VLCC accommodated by the project would not be significantly greater than the impacts currently associated with the largest tankers in the area.[18] He recognized despite formulation of measures to reduce adverse impacts, however, that the environmental impacts of a major oil spill were significant and unavoidable costs that had to be weighed against the project's benefits.[19]

Nor does the Court believe that this single paragraph in an environmental impact statement in excess of 500 pages, despite its prominent place in a summary to a critical section of the FEIS, is so potentially misleading to the statement's readers as to vitiate an otherwise hard look at the environmental consequences of the proposed action. As the Court has previously indicated, a moderately attentive reader would readily perceive this inaccuracy in the statement. Nor is the dispersion model itself devoid of utility for the reader.

Plaintiffs also argue that the FEIS's discussion of the environmental impacts of a major oil spill, which follows the dispersion model analysis, is inadequate and mislead-

ing because consideration is given only to areas which the dispersion model predicts would be affected by an oil spill. This Court cannot agree. Without a doubt, the discussion of environmental impacts is referenced to the dispersion model, and portions of it clearly focus upon areas of coverage projected by the dispersion model. Yet those are the same areas wherein the FEIS finds the greatest risk of a major oil spill and the areas that the dispersion model indicates would be severely impacted by an oil spill in the Inner Bar Channel. This focus, therefore, is neither unreasonable nor uninformative. Moreover, the study considers the effects of oil upon a variety of wildlife and resources found in vast areas of the Bay, and not merely the Galveston Cahnnel-Pelican Island locale. The discussion identifies the amount of oil involved in a spill as a major variable dictating the nature and severity of the impacts, and does not disregard the possibility that a major oil spill might have impacts beyond the immediate vicinity of Galveston Channel.[20]

 In sum, the Court finds plaintiffs' assertion that the FEIS "totally fails" to consider the environmental consequences of a major VLCC casualty-related oil spill overly broad. Through reliable and relevant historical data, the FEIS considers the risks of oil spills associated with the project vis-a-vis existing risks. It considers the likelihood of an oil spill with significantly greater environmental effects than one possible at present. Included in the FEIS is data concerning the major causes of spill-producing tanker casualties, and the average size spill associated with each cause.[21] The data indicates, for example, that groundings and vessel collisions are the two most frequent causes of oil tanker spills,

**15.** FEIS Vol. 1, at 4–129.

**16.** Plaintiffs' Exhibit No. 1, at 10–12, COE R. Vol. 13, at 34–35.

**17.** *Id.* at 23–24, COE R. Vol. 13, at 46–47.

**18.** *Id.* at 11, COE R. Vol. 13, at 34.

**19.** *Id.* at 24, COE R. Vol. 13, at 47.

**20.** FEIS Vol. 1, § 4.2.6. Factors considered include: (1) type of oil spilled; (2) amount of oil spilled; (3) biota of region; (4) season of year; (5) previous exposure of region to spills; (6) present exposure of region to other pollutants; (7) treatment given to spill; and (8) effectiveness of clean-up effort. *See generally id.* §§ 4.2.6 to 4.2.6.6.2.

**21.** *See, e.g.,* FEIS Vol. 1, Table 4.2–5, at 4–114.

and that spills occurring in cases of grounding are on average more than twice the size of spills resulting from collisions or from two less frequent major spill-producing causes, explosion/fires and rammings. Because of the soft bottom conditions in the Galveston Bay area, the FEIS reasonably concludes that the possibility that a massive spill from a grounding is remote.[22] Also considered is the likely effectiveness of traffic control measures in minimizing the risk of a collision involving a VLCC, explosion/fire prevention and mitigation measures, and oil clean-up measures.[23] It is a clear inference from the overall contents of the FEIS that its authors considered the possibility of a VLCC casualty involving a spill of substantially all of its crude cargo to be speculative and remote.

■ Nonetheless, what needs noting is the failure of FEIS to hypothesize a massive VLCC oil spill and to marshall its consideration thereof into one section of the report as a focused "worst case" analysis. *See* 40 C.F.R. § 1502.22(b) (1980). The regulations require a worst case analysis where information relevant to adverse impacts is essential to a reasoned choice among alternatives but the cost of obtaining it is exorbitant, or the means to obtain it are not known. One of the costs that must be weighed by the decisionmaker is the danger presented by proceeding in the face of uncertainty. *See North Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C.Cir.1980); *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C.Cir.), *vacated in part sub nom. Western Oil & Gas Association v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

■ A worst case analysis is requisite to the "statutory minima" of NEPA only to the extent that information in the impact statement relevant to environmental costs otherwise is insufficient to permit reasoned evaluation and decision. *See SLEC v. Sand, supra*, at 1013 n.7; *Sierra Club v. Morton, supra*, at 827. *A fortiori*, if a worst case analysis is to represent something more than "an exercise in frivolous boiler-

plate," *Vermont Yankee, supra*, 435 U.S. at 551, 98 S.Ct. at 1215, it must materially add to the decisionmaker's awareness of "the spectrum of consequences that may result from [the] agency decision . . ." 46 Fed. Reg. 18032 (1981).

Obviously, the worst case analysis contemplated by the CEQ regulations by its very nature must be a somewhat speculative endeavor. *See North Slope Borough v. Andrus*, 486 F.Supp. 332, 347 (D.D.C.), *rev'd on other grounds*, 642 F.2d 589 (D.C.Cir. 1980). It strains credulity, however, to assume that the regulations equate "analysis," as that term is commonly used and understood, with a discussion founded upon uninformed speculation and conjecture. The Court is of the opinion that the informational value of any such discussion in an environmental impact statement would be so marginal as to fall beyond the "statutory minima" of NEPA.

■ It is well settled that an environmental impact statement need not discuss remote and speculative consequences. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1026 (9th Cir. 1980); *Hart and Miller Islands Area Environmental Group, Inc. v. Corps of Engineers*, 505 F.Supp. 732, 748 (D.Md.1980). While plaintiffs have pointed to the historical fact that several VLCCs have been involved in casualties resulting in a total cargo loss, the Court is not persuaded by a preponderance of the evidence before it that the FEIS is fatally flawed by its failure to discuss this possibility in the context of the present action.

■ It is true that the FEIS never attempts a quantitative comparison of the potential severity of the impacts of a major oil spill associated with the proposed action and the impacts of a major oil spill at present. The environmental impacts of an oil spill upon wildlife and resources are discussed in generic terms, without being tied to any volume of spillage. Plaintiffs contend that the FEIS could not sufficient-

---

**22.** *Id.* § 4.9.3.1.3

**23.** *Id.* §§ 2.1.7 to 2.1.13.2, 4.2.2, 4.2.4, 4.2.6. *See* COE R. Vol. 21 (fire and explosion hazard assessment).

ly apprise the decisionmaker of the "spectrum of consequences" associated with the proposal unless the statement attempted a quantitative assessment of the differing volume of spillage entailed in a worst possible casualty with and without the project, and analyzed the probable impacts in light of this assessment. Yet, plaintiffs have drawn this Court's attention to no method by which the Corps could have informatively predicted the extent to which a "worst case" spill might have been transported into Galveston Bay so as to permit any detailed discussion of the comparative severity of impacts with and without the project. The record before the Court suggests no means through which the FEIS could have conducted such an analysis with accuracy beyond an initial 24-hour period. In other words, the evidence fails to show that such an "analysis" could have been predicated on anything more than guesswork. In the absence of proof that a "worst case" discussion in the FEIS would have meaningfully illuminated the dangers or materially added to the decisionmaker's awareness of the spectrum of consequences involved, its absence in the FEIS does not violate NEPA.[24]

### D. Cumulative Impacts

Plaintiffs contend that the FEIS's discussion of the cumulative impacts of the proposed action is deficient in two major aspects: (1) the failure to discuss in any detail the environmental impacts of the proposed federal construction of a deepdraft channel to Texas City; and (2) the failure to consider the environmental impacts of proposed bulk commodities facilities to utilize the expanded deepwater capacity of the Port of Galveston. *See* Plaintiffs' Post-Trial Brief, at 47–56.

The FEIS identified a number of major actions along the Texas coast under consideration by federal agencies when the impact statement was published. One of these was a Galveston Bay Area Navigation study undertaken by the Corps to consider the deepening and extending of the Galveston Harbor and Channel, the Houston Ship Channel, and the Texas City Channel. It is clear from the discussion in the FEIS that the Galveston Channel portion of the study, which concerned enlargement of existing federally constructed waterways, was considered distinct from the private proposal for construction of the multipurpose deepwater port at Galveston.[25]

■ Because the feasibility of a federal project deepening the Texas City Channel was considered by the Corps in single study along with a proposed deepening of the Galveston Harbor and Channel, the plaintiffs argue that the Corps improperly segmented the Texas City project from the instant proposal. The Court does not agree. To determine the appropriate scope of the FEIS, the Court should look to see if the proposal has logical termini, substantial independent utility, or necessarily commits the federal government to the construction of related projects. *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 440 (5th Cir. 1980). *See Environmental Defense Fund v. Marsh, supra,* at 997–99. Clearly, the instant project is distinct from the proposed Texas City project and has substantial independent utility. *Piedmont Heights, supra,* at 440–41. The Court cannot look favorably upon plaintiffs' unsubstantiated assertions that approval of the project will "coerce" congressional approval of the Texas City project if and when a

24. Defendants urge that, if a worst case analysis was required, the Corps' comparison of an oil spill involving 12% of the total cargo of a 33% lightened 150,000 dwt tanker and a 30% lightened 250,000 dwt tanker would suffice. The Court expresses no opinion on that point. It does not find sufficient evidence, however, to support plaintiffs' contention that a worst case analysis, if required, would have to consider a total cargo loss and nothing less.

25. *See* FEIS Vol. 1, §§ 4.5.3 to 4.5.3.2, 4.8.1, 4.8.2.

For purposes of the Navigation study, the Houston, Texas City, and Galveston projects were segmented. The Texas City Channel was the more advanced of these studies; at the time the FEIS was published, a draft environmental statement for the Texas City proposal was in preparation. The FEIS indicated, however, that the Texas City project, and other federal projects in the Bay area under consideration by the Corps which required congressional authorization, would be planned and considered in light of the instant project, if approved. *Id.* § 4.8.

proposal for federal action is made. *Environmental Defense Fund v. Marsh, supra,* at 998. Indeed, the current project with its pipeline system may undermine the need for the Texas City project.[26]

■ NEPA requires a comprehensive impact statement in certain situations where several proposed actions are pending at the same time. *Kleppe v. Sierra Club, supra,* 427 U.S. at 409, 96 S.Ct. at 2729. A comprehensive assessment is not required in all cases, however. An agency may approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing a statement on the cumulative impacts of remaining proposals. *Id.* at 414 n.26, 96 S.Ct. at 2732. This is precisely the approach the Corps indicated it would take in the FEIS, and it is an approach fully consonant with NEPA. *Environmental Defense Fund v. Marsh, supra,* at 999.

It is significant that the FEIS identifies every existing project under consideration by federal agencies along the Texas coast, and, where possible, the extent to which agency evaluation of environmental effects is available. NEPA does not require an agency to restate all of the environmental effects of other projects presently under consideration. Where the underlying data base includes approved projects and pending proposals, the "statutory minima" of NEPA has been met. *Piedmont Heights, supra,* at 441; *North Slope Borough v. Andrus* (D.C.Cir.) *supra,* at 601. Nor does NEPA require an agency to consider the possible impacts of less imminent actions when preparing an impact statement on a proposed action. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval on the existing environment. The condition of that environment presumably will reflect

earlier proposed actions and their effects. *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n.20, 96 S.Ct. at 2730; *SLEC v. Sand, supra,* at 1015–16.

The failure of the FEIS to consider the environmental impacts of bulk commodities projects related to the deepening of the Galveston Channel and Harbor presents a similar problem. The deepwater port project envisions increased bulk cargo transportation by deepdraft vessels.[27] The FEIS notes, however, that expanded bulk commodities trade will require modification and additional construction of port facilities not a part of the instant proposal.[28] The evidence before the Court demonstrates that these related projects were remote contingencies when the present proposal for action was made. In fact, plaintiffs prominently note that these projects have failed totally to materialize. *See* Plaintiffs' Post-Trial Brief, at 49–50.

Nevertheless, it is assumed throughout the FEIS that these projects will reach fruition, resulting in substantial economic benefits attributed directly to the instant project. The FEIS goes so far as to predict the increased volumes of commodities that will be handled at the Port, and to project a substantial increase in vessel traffic associated with the proposed action as a result.[29] Curiously, however, the FEIS declines to consider the potential environmental effects of this expansion, other than to recognize that the introduction of additional deepdraft bulk carriers into the area might increase the risk of tanker casualties.[30]

Essentially, plaintiffs' position is that the authors of the FEIS cannot have their cake and eat it too; that is, the FEIS, consistent with NEPA, cannot extoll the benefits of related bulk commodities projects as a justification for the proposed action while declining to consider the potentially greater cumulative environmental impacts that

---

26. Apparently, however, the Corps intends to recommend the Texas City project to Congress as a proposal for federal action.

27. *See, e.g.,* FEIS Vol. 1, § 2.2.3.3.4.

28. *Id.* § 4.1.8.3.

29. FEIS Vol. 1, § 1.2.3.1, 4.1.8.3.4.

30. *Id.* § 4.2.2.3.1. The FEIS declined to do so because it found the extent of increased deepdraft bulk cargo traffic unquantifiable.

**1236**

might result. *See Chelsea Neighborhood Association v. U. S. Postal Service,* 516 F.2d 378, 388 (2d Cir. 1975). The Court certainly agrees with this assessment as a general proposition; however, it does not find *Chelsea Neighborhood* dispositive of the case at bar.

In *Chelsea Neighborhood* the Postal Service acquired a piece of property in New York City. Subsequently, it was proposed that a major postal service vehicle maintenance facility be constructed on the site, with a multi-story housing project to be built on the roof of that facility. The EIS clearly indicated that the proposed action involved construction of the postal facility in combination with the multi-story housing project. 516 F.2d at 378. Accordingly, the Second Circuit rejected the Postal Service's argument that the postal facility and housing project could be segmented for purposes of NEPA. *Id.* at 388. The court found that the utilization of the housing project as a "selling point" without disclosing its possible negative aspects did not comport with NEPA. The court also found the EIS significantly deficient because it failed to assess the importance and impact of the postal facility standing alone. *Id.* at 389.

 It is true in this case the Corps extolled the economic benefits of related bulk cargo projects as a "selling point" for the proposed action. But there any similarity with *Chelsea Neighborhood* ceases. The parameters of the proposed action in this case clearly are identified by the FEIS as involving only the deepening of the Galveston Channel and Harbor and the construction of a crude oil distribution system.[31] The related project in *Chelsea Neighborhood* plainly was an actual proposal requiring consideration in the EIS. At best, the related projects in this case are contemplated actions for which preparatory designs and studies were underway, but which to date have failed to materialize. The Corps may properly consider the environmental impacts of these related projects in light of

the effects of the present proposal if and when these projects mature into actual proposals. Given that conclusion, the Supreme Court's opinion in *Kleppe v. Sierra Club, supra,* clearly indicates that NEPA does not yet require the Corps to evaluate the environmental impacts of these remote and speculative projects.[32] *See also Environmental Defense Fund v. Marsh, supra,* at 999; *SLEC v. Sand, supra,* at 1015–16.

### E. Alternatives

Section 102(2)(C)(iii) of NEPA requires a federal agency in assessing the environmental effects of a project to discuss alternatives to the proposed action. The purpose of the alternatives requirement is to assure that the decisionmaking agency has considered methods of achieving the desired goal other than the proposed action. *Piedmont Heights, supra,* at 436; *Sierra Club v. Morton, supra,* at 815. Consideration of other realistic possibilities for action forces an agency to consider the environmental effects of a project and evaluate those effects against the effects of alternatives. *Piedmont Heights, supra.*

 The agency determines what alternatives should be considered and how extensive the consideration should be, subject to a rule of reason. *North Slope Borough v. Andrus* (D.C.Cir.), *supra,* at 601; *Alaska v. Andrus, supra,* at 475. *See Vermont Yankee, supra,* 435 U.S. at 551, 98 S.Ct. at 1215. Clearly, NEPA requires a discussion of all alternatives to a project which would reduce environmental harm while still achieving the goals to be accomplished. An alternative which would result in similar or greater harm, however, need not be discussed. *SLEC v. Sand, supra,* at 1017, *Sierra Club v. Morton, supra,* at 825, 826.

 The role of the court in reviewing an agency's consideration of alternatives is strictly limited. The court's sole

---

**31.** *E.g.,* FEIS Vol. 1, *summary,* at ii, iv.

**32.** *Chelsea Neighborhood* precedes *Kleppe,* and significant portions of the appellate court's reasoning seem at odds with the subsequent pro-

nouncements of the Supreme Court. *Compare Chelsea Neighborhood, supra,* at 388 *with Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n.20, 96 S.Ct. at 2730.

function is to determine whether the environmental impact statement's explanation of alternatives is sufficient to permit a reasoned choice among the different courses of action. *Isle of Hope, supra,* at 220; *Save Our Sycamore v. Metropolitan Rapid Transit Authority,* 576 F.2d 573, 575 (5th Cir. 1978). *See Sierra Club v. Morton, supra,* at 815. While the agency must consider environmentally preferable alternatives, it is not required by NEPA to elevate environmental concerns over other appropriate considerations. *Stryker's Bay, supra,* 444 U.S. at 227, 100 S.Ct. at 499. *SLEC v. Sand, supra,* at 1011. Once the agency adequately describes the viable alternatives, the decision of which alternative to follow is within the agency's discretion, and upon ascertaining that alternatives were given reasonable consideration, this Court's inquiry ends. *SLEC v. Sand, supra,* at 1017; *Hart and Miller Islands, supra,* at 751–52.

The FEIS discusses, among others, "no action" and offshore alternatives to the proposed action, and assesses the environmental impacts of these alternatives.[33] Plaintiffs' basic concern is with the FEIS discussion of the offshore alternatives. Plaintiffs contend that the impact statement's consideration of this alternative is so superficial as to obscure its "clear environmental superiority." Plaintiffs' Post-Trial Brief, at 42.

The Court finds this argument without substance. The FEIS notes that offshore alternatives would avoid inland port congestion, which, as pointed out in other areas of the statement, would reduce the risks of oil spills near environmentally sensitive areas of Galveston Bay, and would not require extended dredging, thus reducing environmental effects associated with that activi-

ty.[34] The FEIS also indicates that the risks to sensitive estuarine areas of the Bay presented by an offshore spill probably would be less than those associated with the proposed action.[35] It is noted that a comparison of oil spill risks onshore and offshore is problematic due to the limited data for predicting offshore spills, and that containment and clean-up of offshore spills tends to be more difficult.[36] The FEIS predicts that the offshore alternative would have little or no significant effects upon nekton, benthic populations, and oyster reefs.[37]

■ The Court finds that the FEIS's discussion of alternatives was sufficient to meet the statutory minima of NEPA. The additional testimony offered by plaintiffs at the hearing is in the main informative and provides additional detail. Its inclusion might have proved helpful to the reader and decisionmaker. The specificity of EIS treatment of alternatives, however, is a matter of agency discretion. *North Slope Borough v. Andrus* (D.C.Cir.), *supra,* at 601; *NRDC v. NRC,* 606 F.2d 1261, 1272 (D.C. Cir.1979). So long as the impact statement's discussion of alternatives is sufficient to permit a reasoned choice among different courses of action, the decision of which alternative to follow is also within the agency's discretion. *SLEC v. Sand, supra,* at 1017. Here, the Corps selected an alternative which it found, while not environmentally preferable, to be environmentally acceptable.[38] Nothing in the record suggests that this selection was arbitrary, capricious, an abuse of agency discretion, or otherwise not in accordance with law, and there this Court's inquiry must end.

**33.** FEIS Vol. 1, §§ 2.2 to 2.2.6, 4.9 to 4.9.4.5.

**34.** FEIS Vol. 1, § 2.2.3.1.3.

**35.** *Id.* Table 2.2–1, at 2–108, § 4.9.3.1.2. In considering and evaluating the offshore alternative, the FEIS relies heavily upon the DOT section 4(d) report comparing the TDPA proposal and the Galveston proposal from an economic, environmental, and social viewpoint. Plaintiffs complain that the FEIS fails to highlight the DOT report's conclusion that the offshore alternative was environmentally preferable. That report, however, was part of the

administrative record, and was readily available to public access. Plaintiffs also note that every major federal environmental agency expressed a preference for the offshore alternative. That, too, is part of the record. There is no evidence that the Corps failed to consider these views in the decisionmaking process.

**36.** *Id.* § 4.9.3.1.2.

**37.** *Id.* Table 4.9–1, at 4–188.

**38.** Plaintiffs' Exhibit No. 1, at 25, COE R. Vol. 13, at 48.

*F. Challenged Economic Benefits*

The FEIS assigned three major benefits to the proposed action. First, the FEIS found that the proposed action would be of benefit in providing an efficient means of dealing with projected increases in the importation of foreign crude oil.[39]

Second, the FEIS concluded that the proposed action would permit transportation cost savings of approximately 23¢ per barrel as compared to present means of importing foreign oil. The FEIS recognized that the potential benefits of this cost savings could range from moderate to major depending upon alternative assumptions concerning future energy-related events.[40] It also recognized that predictions of the future demand for oil varied widely, citing a 1976 Federal Energy Administration study projecting nationwide imports by 1985 as low as one million barrels per day to 13.5 million barrels per day.[41] Further, it considered the proposed action in light of projections of imports into the five major Texas ports served by the project ranging from a low of 855,000 barrels per day—half of the 1977 level of imports into the area—to a three-fold increase in 1977 levels.[42]

Third, the FEIS concluded that the proposed action would offer capabilities for expanded bulk commodities handling at the Port of Galveston. The statement noted that bulk commodities constituted a significant portion of the trade at Galveston, and that port facilities were currently loading commodities into partially loaded larger bulk carriers. It reasoned that the deepwater channel would allow these vessels to be more fully loaded without entailing an increase in ship traffic.[43] Nevertheless, the FEIS went far beyond consideration of mere "capabilities" in connection with bulk commodities. See discussion by the Court in Section II.D. *supra.*

Plaintiffs challenge the validity of the economic benefits sought to be achieved by construction of the project on all three grounds. First, plaintiffs argue that the vitality of data relied on by the FEIS in projecting increases in imports of foreign oil had been so impugned by significant changes in the overall energy picture at the time the FEIS was published as to provide no rational basis for a conclusion that the proposed action was justified by events likely to occur in the future. Second, plaintiffs assail the computation of cost savings relied on by the FEIS, or, in the alternative, argue that the FEIS failed to recognize that an offshore alternative would realize significantly greater cost savings. Finally, plaintiffs submit that it was improper for the FEIS to assign economic benefits to the project flowing from speculative and uncertain related proposals concerning bulk cargo handling.

At the outset, the Court notes that NEPA permits, at most, only a narrowly focused, indirect review of the economic assumptions underlying a federal project described in an impact statement. Determination of economic non-environmental benefits is extremely tangential to the concerns expressed in NEPA, and assessment of purely economic costs and benefits fall within a wide area of agency discretion not subject to reexamination by federal courts under the guise of judicial review of agency action. *SLEC v. Sand, supra,* at 1011.

There are occasions, however, when a court must review an agency's economic assumptions pursuant to NEPA. In taking a "hard look" at the environmental consequences of a proposed action, NEPA requires the decisionmaking agency to weigh the potential environmental harms of the action against its economic benefits. In order for a reviewing court to determine whether the agency has complied with NEPA, the court must consider whether the economic considerations against which the environmental considerations were weighed were so distorted as to impair fair consideration of those environmental consequences.

---

**39.** FEIS Vol. 1, §§ 1.2 to 1.2.1.8.

**40.** *Id.* §§ 4.1.8.2.26 & 4.1.8.2.27.

**41.** *Id.* § 1.2.12.

**42.** *Id.* §§ 1.2 to 1.2.18, 1.2.4.

**43.** *Id.* §§ 1.2.3. & 1.2.4.

Without a showing that the economic justifications are, or have become, so flawed as to distort grossly the FEIS's presentation of environmental consequences, however, there is no review of economic benefits. If the requisite showing is made, the Court must conduct a limited review of agency action to determine whether the actual balance of costs and benefits struck by the agency according to the standards of sections 101 and 102 of NEPA was arbitrary or clearly gave insufficient weight to environmental concerns. *Id.* at 1011–14. *See Sierra Club v. Morton, supra,* at 827.

At the hearing plaintiffs offered revised projections of anticipated volumes of oil imports in view of recently changing conditions affecting supply and demand in the energy field. One of plaintiffs' experts projected that, assuming demand for crude oil remains at current levels or declines at an annual rate of 3%, nationwide imports between now and 1990 could range from 2.5 to one million barrels per day. *See* Plaintiffs' Exhibit No. 115. Yet, the FEIS, in assessing widely divergent predictions of future demand, considered the possibility that nationwide imports by 1985 might be as little as one million barrels per day or as great as 13.5 million barrels per day. Further, it considered the possibility that imports into the five major Texas ports to be served by the project might remain at 1977 levels or decline substantially below that amount. The accuracy of the agency's assessment of economic benefits is not subject to reexamination in the guise of judicial review under NEPA unless the selection of data by the agency grossly distorts presentation of the environmental consequences of the project. In this instance, the Court finds that it does not. *SLEC v. Sand, supra,* at 1014.

There is no doubt that economic factors relevant to the proposed action did not remain static from inception of agency review under NEPA until the decision to issue the permit was made. Nor have they ceased to change since then. Over time, economic realities do change. *Id.* at 1014–15. The plaintiffs have failed to sustain their evidentiary burden in this instance, however. Proof on an issue such as the inaccuracy of

energy demand projections is inherently difficult because of the uncertainty underlying the projections. Merely citing a conflicting projection does not prove the invalidity of another projection. *Piedmont Heights, supra,* at 442. Opinion estimates can be most precise when the matters involved are simple; as they become more complex and uncertain, the ability to forecast becomes more a guess and less a prediction. *Sierra Club v. Morton, supra,* at 827.

Plaintiffs also argue that the data base for the conclusion that the proposed action would result in a 23¢ per barrel transportation cost savings has been discredited by changing economic realities. Significantly, however, while several of plaintiffs' experts opined that they would not have relied upon a 1978 transportation cost savings report in evaluating the economic benefits of a project in 1980, none was willing to testify that the proposed action would not produce cost savings over present methods of importing foreign oil. It is not for the Court to review every economic calculation which an agency puts into its environmental impact statement. The Court may evaluate economic justifications in the impact statement only where plaintiffs demonstrate by a preponderance of the evidence that the justifications have become so flawed that they grossly distort the environmental considerations. *SLEC v. Sand, supra,* at 1015. The requisite showing has not been made.

Plaintiffs apparently do not dispute the FEIS's consideration of the projects's capacity to make more efficient use of larger bulk carriers presently utilizing the Port of Galveston as an economic benefit of the project. They do assert, however, that it was improper for the FEIS to assign economic benefits of increased bulk commodities trade, contingent upon modification and additional construction of port facilities, as a "selling point" of the project, particularly since the related projects have failed to materialize. The Court agrees. However, plaintiffs have failed to show that the erroneous assignment of these benefits to the project had any effect on the

FEIS's presentation of the environmental consequences of the project itself. *Id.* at 1014. Assuming otherwise, the Court is unable to conclude from the record before it that deletion of this supposed benefit so disturbs the actual balance of cost and benefits struck by Corps as to demonstrate that the balancing was arbitrary or clearly gave insufficient weight to environmental factors. *See id.* at 1013.

### G. The Corps' Coordination Efforts: Hard Look or Hard Sell

Section 102(C) of NEPA requires a decisionmaking agency to consult with and obtain the comments of other federal agencies having relevant jurisdiction or expertise. Clearly, FWS is one such agency, and the administrative record in the case reflects extensive coordination between the Corps and FWS during the course of the NEPA process. Plaintiffs contend, however, that the Corps' efforts fell short of the statutory requirement because the agency failed to obtain and consider a formal report and additional comments which the FWS Galveston office attempted to prepare and submit subsequent to publication of the FEIS but prior to Sigler's decision.

The record [44] reflects a change of personnel in the Galveston office of FWS in early 1980. The new field supervisor, David M. Harris, independently reviewed the FEIS, and concluded that it was deficient in several significant respects. Further, he concluded that FWS had never conducted an adequate analysis of the environmental impacts of the project during nearly two years of environmental review, and that the FWS and DOI had failed to satisfy their separate obligation under the FWCA to prepare and submit a formal report for incorporation into the FEIS. Harris notified the Corps of his intentions, and in late March 1980, with apparent approval of his immediate supervisors, initiated work on the independent analysis and FWCA report.

The Corps' response to the news was less than enthusiastic. Sigler expressed the view that the new efforts would add little of any significance to the administrative record, and expressed concern that ensuing delay would frustrate his announced timetable for decision. Sigler clearly, and correctly, understood that all previous FWS–DOI objections to the issuance of the permits in question had been satisfactorily addressed.

■ The record plainly shows that the Corps did not welcome these new, and in the overall context of the NEPA process, belated efforts by local FWS officials; however, the record does not substantiate plaintiffs' claim that Sigler "arbitrarily refused to accept any further information from the FWS relating to the Galveston project." Plaintiffs' Post-Trial Brief, at 58. Rather, Sigler informed Harris in April that the Corps would not consider any newly amassed information unless he received confirmation from higher ranking officials in FWS and DOI that the agencies wished to voice additional objections to the proposed action. This was not an unreasonable request under the circumstances, since all previous FWS–DOI comments, although closely tracking the recommendations of local FWS officials, had been received through these channels. Harris, however, did not consult with DOI. Subsequently, in May, Sigler wrote the Assistant Secretary of the Interior, further discussing the issue of the "worst case" analysis, seeking confirmation that all previous FWS–DOI objections had been met, and inquiring whether the agencies intended to voice new objections.

Two days before Sigler wrote the Assistant Secretary, representatives of the permit applicants met with the Director of FWS and the Secretary of the Interior in Washington. Local FWS activity was the subject of the meeting. Shortly thereafter, the Director of the FWS instructed his subordinates to cease further activity in connection with the proposed action. Subsequent communications between FWS and commenting members of the public evidence the agen-

---

44. In its limited capacity as fact finder, the Court has considered the administrative record compiled by the Corps of Engineers, the DOI

record pertinent to NEPA and the FWCA, the interrogatories and depositions on file, and the exhibits and testimony offered at the hearing.

cy's official view that its objections to the project had been satisfactorily addressed, and this was confirmed by DOI in a belated response to Sigler's communication of May 7, 1980.

From all of this, plaintiffs would have this Court conclude that the Corps in a blatant display of arbitrariness and caprice failed to satisfy the consultation requirements of NEPA. The Court declines to do so. Sigler never indicated categorically that he would not consider additional information compiled by the local FWS office. Rather, he gave every indication that he would consider additional comments, to the point of delaying his announced timetable for decision, if they represented the *official* position of FWS and DOI. It was not the responsibility of the Corps, under NEPA, to resolve internal discord in FWS; it was the responsibility of the Corps to consult with FWS and other concerned federal agencies and to consider and evaluate the comments

it received from these agencies in the permit review process. The Corps' consultation requirement, as is true generally with respect to the procedural strictures of NEPA, must be adjudged against a standard of reasonableness. Under that standard, the Corps' efforts were sufficient to meet the statutory minima of the Act, which is all that is required.[45]

### III.

### THE FISH AND WILDLIFE COORDINATION ACT

Congress enacted the FWCA, as amended in 1958, to ensure that the conservation of the nation's wildlife resources would be elevated to peer status with other considerations relevant to water-resource development programs. 16 U.S.C. § 661. The consultation and reporting requirements of section 662[46] of the Act provide the means for implementation of congressional intent.

**45.** Plaintiffs suggest that if the FWCA required the Corps to obtain a formal report from DOI in this instance, the Corps' omission to do so would also violate the consultation requirements of NEPA. It is well settled that the only procedural requirements imposed by NEPA are those stated in the plain language of the Act. *Vermont Yankee, supra,* 435 U.S. at 548, 98 S.Ct. at 1213. Because the Court holds that a formal FWCA report was not required under the circumstances of this case, however, it does not address this contention. Refer to Section III *infra.* Insofar as the additional reports and conclusions of local FWS officials have been admitted as evidence, the Court has considered them in assessing the adequacy of the FEIS.

**46.** 16 U.S.C. § 662. That section provides in relevant part:
§ 662. Impounding, diverting, or controlling of waters
(a) Consultations between agencies. Except as hereafter stated in subsection (b) of this section, whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the im-

poundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development.
(b) Reports and recommendations; consideration. In furtherance of such purposes, the reports and recommendations of the Secretary of the Interior on the wildlife aspects of such projects, and any report of the head of the State agency exercising administration over the wildlife resources of the State, based on surveys and investigations conducted by the United States Fish and Wildlife Service and such State agency for the purpose of determining the possible damage to wildlife resources and for the purpose of determining means and measures that should be adopted to prevent the loss of or damage to such wildlife resources, as well as to provide concurrently for the development and improvement of such resources, shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress or to any agency or person having the authority or the power, by administrative action or otherwise, (1) to authorize the construction of water-resource development projects or (2) to approve a report on the modification or supplementation of plans for previously authorized projects, to which this Act applies....

Section 662(a) requires consultation between FWS, DOI and any federal agency (1) that proposes or is authorized to deepen a channel of water, impound, divert or otherwise control or modify a stream or body of water for any purpose, including navigation and drainage, or (2) that proposes to issue a federal permit or license authorizing such activity by a private or public entity. *See Udall v. FPC*, 387 U.S. 428, 443–44, 87 S.Ct. 1712, 1720, 18 L.Ed.2d 869 (1967); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 607 (3d Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); *Zabel v. Tabb*, 430 F.2d 199, 210 (5th Cir.), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1970). Consultation is required with a view to conservation of wildlife resources and development and improvement of these resources in connection with water-resource developments.

In furtherance of these purposes, section 662(b) requires that a report and recommendation of the Secretary of the Interior, based on surveys and investigations conducted by FWS, be made an integral part of any project report presented by a federal agency responsible for engineering surveys and construction of a water-resource project referred to in section 662(a) to Congress or to another agency empowered to authorize the construction of the project. *Id.* § 662(b).

Plaintiffs argue that the FWCA required DOI to prepare a formal written report for incorporation into the FEIS in this case. First, they argue that the reporting requirements of section 662(b) apply to all water-resource development projects identified in section 662(a), whether federally financed and constructed or privately constructed under federal license or permit. Second, assuming section 662(b) to apply only to federal projects, they argue that the proposed action here is such a project. In either event, plaintiffs conclude that DOI and the Corps failed to comply with the procedural requirements of the FWCA, and that the Corps' decision to issue the permits in question must be set aside.

Plaintiffs observe that, prior to the 1958 amendments to the FWCA, the Act's provisions were inapplicable to dredging and filling of bays and estuaries by private interests under license or permit from a federal agency such as the Corps. *See* S.Rep.No. 1981, 85th Cong., 2d Sess. 4, *reprinted in* [1958] U.S.Code Cong. & Ad.News 3446, 3450; *Zabel v. Tabb, supra*, at 209–10. Clearly, however, the consultation requirements of the 1946 version of the legislation applied to private water-resource development projects proceeding under federal license or permit. Act of Aug. 14, 1946, ch. 965, § 2, 60 Stat. 1080. The 1958 amendments merely added to the list of projects requiring consultation those projects involving the deepening of a channel or the modification of a stream or body of water for any purpose, including navigation and drainage. *See* 16 U.S.C. § 662(a).

The 1958 amendments to the FWCA, while expanding the category of water-resource development projects to which the Act applies, did not address the question whether the Act's formal reporting requirements applied to private, as opposed to federal water projects. The 1946 version of the FWCA required only that "the reports and recommendations of the Secretary of the Interior ... be made an integral part of any report submitted by any agency of the federal government responsible for engineering surveys and construction of such projects." Act of Aug. 14, 1946, ch. 965, § 2, 60 Stat. 1080. That requirement remains unchanged in the present law. *See* 16 U.S.C. § 662(b).

Plaintiff's argument in this case is one of statutory construction. They contend that section 662(b) use of the phrase "such projects" in reference to the water projects identified in section 662(a) compels the conclusion that the Act's formal reporting requirements apply to federally and privately constructed projects. This construction of the FWCA, however, ignores the express limiting language of section 662(b). The language of that section makes clear that Congress intended to require a formal FWCA report only in the case of federally constructed projects. When a federal agency responsible for construction of a water-resource development project referred to in

section 662(a) submits a report to Congress or another administrative agency empowered to authorize construction of the project, Congress intended that a formal FWCA report be prepared and integrated into the agency's project report. "Such projects" refers to the types of water-resource development projects identified in section 662(a), *i.e.*, the impounding, diverting, channel deepening, controlling or modification of a stream or body of water, and is not, in view of the plain and unambiguous directive of section 662(b), a reference to federally licensed or permitted private development projects. Congress intended only that the Corps consult FWS before issuing a permit for private dredge and fill operation. See *Udall v. FPC, supra,* 387 U.S. at 443–44, 87 S.Ct. at 1720; *United States v. Stoeco Homes, Inc., supra,* at 607; *Zabel v. Tabb, supra,* at 210. *See generally* M. J. Bean, The Evolution of National Wildlife Law (1977).

Plaintiffs also contend that the reporting requirements of the FWCA apply to the instant project because it is in reality a federal project. Plaintiffs argue this is so because the applicants, subsequent to the issuance of the Corps permits, have petitioned Congress for a substantial appropriation of funds to finance the project. Whether congressional provision of financial assistance in such circumstances would transform a private project into a federal one is an intriguing and novel question. It is not, however, a question presented in this case. The permit applicants' appeals for federal assistance have yet to bear fruit, and plaintiffs do not suggest that a congressional appropriation is even likely, much less imminent. This Court has no doubt that Congress would look askance at any action it perceived as an attempt to circumvent the stricter requirements of the FWCA, and for that matter, NEPA, which apply to federal projects. Nor is this Court so willing to assume, as plaintiffs apparently are, that Congress would provide funding for the instant project without requiring that the procedural mandates of congressionally enacted environmental protection laws be complied with fully.

## IV.

## CONCLUSION

The five permits challenged in this case were issued by the Corps of Engineers pursuant to section 404 of the FWPCA, 33 U.S.C. § 1344, and section 10 of the River and Harbors Appropriation Act of 1899, 33 U.S.C. § 403. General regulatory policies promulgated by the Corps under these statutes require the decision whether to issue a permit to be based on a public interest review, which entails consideration of all relevant factors to a proposal, and authorizes the issuance of a permit only if the benefits which reasonably may be expected to accrue from the proposal preponderate against its reasonably foreseeable detriments. 33 C.F.R. § 320.4 (1980). Among the relevant factors cited in the regulations are economics, general environmental concerns, fish and wildlife values, and energy needs.

Plaintiffs' challenges to agency decision-making under NEPA and the FWCA have assailed the Corps' assessment of each of these factors in the general balancing process. Plaintiffs contend that with the economic justifications for the project overstated from the inclusion of speculative or non-existent benefits, and with the potential adverse environmental effects of the project understated due to inadequate consideration of the impacts of a major oil spill, viable alternatives, and the project's likely effects upon fish and wildlife resources, no rational basis can be found in the administrative record or the FEIS for the Corps' conclusion that a balance was clearly struck in favor of the development of the project.

The Court has attempted to give careful consideration to each of plaintiffs' major contentions within the limited scope of review authorized by NEPA and the APA. Through the course of this litigation defendants, and especially intervenors, have grown fond of characterizing the totality of plaintiffs' objections to the FEIS as "fly specking." *See Citizens for Mass Transit v. Adams, supra,* at 313. It should be apparent from the tenor of the Court's opinion that its assessment of the merits of plaintiffs' claims is somewhat different.

Nevertheless, this Court's sole function under NEPA is to ensure that the decision-making agency has considered the environmental consequences of its action by compiling an environmental impact statement with sufficient information to permit a reasoned decision. *Stryker's Bay, supra,* 444 U.S. at 227, 100 S.Ct. at 499; *Vermont Yankee, supra,* 435 U.S. at 558, 98 S.Ct. at 1219. Nor may the Court "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n.21, 96 S.Ct. at 2730. Hence, an agency decision may be set aside only if shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

This standard, however, is not as easily applied as it is described. Determining whether an impact statement has considered all relevant environmental influences in sufficient detail to permit a well informed and reasoned decision can hardly be considered a "bright line" test.[47] The Court has struggled with its decision in this case, and in so doing, it has struggled with the parameters of its responsibility. In the final analysis, however, the Court finds that the FEIS prepared by the Corps, although less than perfect, satisfies the statutory minima of NEPA. Plaintiffs have failed to show that the impact statement is so fatally flawed as to require this Court to set aside the Corps' decision and remand the action to the agency with directions to compile a supplemental EIS. This Court might take issue with the Corps' conclusion that the benefits from the project *clearly* outweigh its detriments, but it cannot conclude that the decision was arbitrary or capricious. To require a reconsideration of the project on any other basis would amount to an impermissible substitution of the Court's judgment for the expert judgment of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

47. *See, e.g.,* Mr. Justice Marshall's dissent to the Court's *per curiam* opinion in *Stryker's* *Bay.*

Therefore, the decision of the Corps of Engineers to permit the construction of a multipurpose deepwater port and crude oil distribution system at Galveston, Texas, is AFFIRMED. The Court will direct entry of judgment in accordance with the Memorandum and Order.